**Joseph DYDIO, Plaintiff,**

v.

**HESSTON CORPORATION, Defendant.**

No. 94 C 7319.

United States District Court,
N.D. Illinois,
Eastern Division.

May 22, 1995.

Michael John Maher, Gregory Linn Cochran, McKenna, Storer, Rowe, White & Farrug, Chicago, IL for plaintiff.

Thomas Douglas Lupo, John Joseph O'Malley, Kathleen Dillon Narko, Lisa L. Harris, Seyfarth, Shaw Fairweather & Geraldson, Chicago, IL, for defendant.

## *MEMORANDUM OPINION AND ORDER*

CASTILLO, Judge.

Plaintiff Joseph Dydio ("Dydio") brings this citizen suit against the Hesston Corporation ("Hesston") under the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6901 *et seq.*, as amended (1983 & Supp.1995), alleging that Hesston is responsible for petroleum contamination resulting from leaking underground storage tanks ("USTs") located on the property now owned by Dydio. Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), Hesston moves to dismiss the complaint.

### *BACKGROUND*

Dydio's well pleaded allegations, accepted as true on a motion to dismiss, *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 420 (7th Cir.1994), are as follows. In November of 1985, Dydio purchased real property located in Elk Grove Village, Illinois. Compl. ¶ 1. From January 1965 through July 1975, the property was owned by the Joseph Goder Building Corp. ("Goder").[1] *Id.* ¶ 3. Goder installed, operated, and maintained USTs containing petroleum on the property. *Id.* The USTs were never used after Goder vacated the property on approximately July 10, 1975; Goder was the last entity who owned the USTs immediately prior to discontinuation of their use in 1975. *Id.* ¶¶ 4, 13. In July of 1994, the

USTs were determined to be leaking petroleum products. *Id.* ¶ 8. Petroleum-contaminated soil presently remains on the property. *Id.* ¶ 9. The petroleum-contaminated soil contains known carcinogens including benzene and ethylbenzene as well as suspected carcinogens including toluene and xylene. *Id.* ¶ 47. Despite notice provided to Hesston by Dydio, Hesston has refused to undertake corrective action with respect to the contaminated property. *Id.* ¶¶ 16, 21. Finally, Dydio alleges that by failing to undertake corrective actions, Hesston is in violation of regulations promulgated under RCRA. *Id.* ¶ 22.

Dydio seeks (a) declaratory relief declaring Hesston the "owner" of the USTs located on the property and finding that Hesston has violated (and is in violation of) RCRA; (b) an order directing Hesston to undertake corrective action; and (c) fines in the amount of $50,000 per day for each day Hesston violated RCRA, attorney's fees and expenses incurred in bringing this suit, and other relief this Court deems appropriate and just.

■ Hesston contends that count I of the complaint must be dismissed because (1) it is based on wholly past violations and impermissibly attempts to apply RCRA retroactively; and, (2) Illinois' underground storage tank program supersedes RCRA's underground storage tank provisions. Hesston maintains that count II must be dismissed because petroleum is not a solid or hazardous waste but rather it is a useful product regulated solely by subchapter IX of RCRA and the regulations promulgated thereunder. Finally, Hesston contends that Dydio seeks civil penalties in access of those authorized by RCRA; accordingly, Hesston moves to strike Dydio's inflated civil penalty claim.[2]

---

1. On or about July 10, 1975, Goder merged with Hesston, the named defendant in this case. Dydio's claim against Hesston is premised on the allegation that Hesston is responsible for Goder's regulatory liabilities. For ease of exposition, this opinion shall, at times, substitute the name "Hesston" for "Goder" when discussing or quoting the allegations of the complaint.

2. In his response to Hesston's motion, Dydio concedes that his request for civil penalties in the amount of $50,000 per day exceeds the maxi-

mum penalties allowed by RCRA. 42 U.S.C. § 6991e(d)(2) authorizes civil penalties not to exceed $10,000 for each tank for each day of violation to be assessed against any owner of a UST who fails to comply with the regulations promulgated by the Administrator of the Environmental Protection Agency ("Administrator") under 42 U.S.C. § 6991(b). Dydio states that he will amend his complaint to request civil penalties of $10,000 for each tank for each day of violation. In its reply memorandum, Hesston argues for the first time that Dydio cannot recov-

### ANALYSIS

*HESSTON'S CHALLENGES TO COUNT I*

Count I of Dydio's complaint asserts a citizen suit under 42 U.S.C. § 6972(a)(1)(A) which provides:

**§ 6972 Citizen suits**

**(a) In general**

Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—

(1)(A) against any person ... who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter[.]

42 U.S.C. § 6972(a)(1)(A) (hereinafter "Subsection A").

A. *Illinois' UST Program*

■ As noted above, Hesston contends that a Subsection A citizen suit may not be maintained to enforce subchapter IX because Illinois operates its own UST program that operates in lieu of and therefore supersedes RCRA. In support of this contention, Hesston has submitted various documents evidencing the existence of a state UST program funded, in part, by federal funds authorized under a cooperative agreement between USEPA and Illinois EPA pursuant to 42 U.S.C. § 6991b(h)(7)(A).[3]

The short answer to Hesston's position is that the statutory provisions authorizing states to exercise authority to undertake corrective actions with respect to petroleum releases (or to cause such corrective actions to be undertaken by owners of USTs) and authorizing cooperative agreements of the sort presented here are entirely separate and distinct from the statutory provisions allowing

the Administrator to authorize a state program to operate in lieu of RCRA. *Compare* 42 U.S.C. § 6991b(h)(7)(A) and 42 U.S.C. § 6991c. Under the latter provisions, the Administer may authorize a state program to operate in lieu of RCRA, after notice and opportunity for public comment, where, *inter alia*, the requirements of the state program are no less stringent than the corresponding requirements promulgated by the Administrator under RCRA. *See* 42 U.S.C. § 6991c(b)(1).

Hesston has submitted nothing to suggest that the Administrator has approved an Illinois program to operate in lieu of RCRA—and, indeed, Hesston acknowledges that Illinois' program is not approved by the Administrator. Nevertheless, Hesston argues that the Administrator has provided "constructive authorization" by entering into the cooperative agreement and that Illinois' UST program operates in lieu of the Federal program "for all practical purposes." Def.'s Reply at 1–2. There is no statutory or other support for these contentions and the Court finds them to be wholly without merit. Accordingly, the Court finds that RCRA is not superseded by Illinois' UST program and Hesston's motion to dismiss count I on this ground is, therefore, denied.

B. *Present or "Wholly Past Violations"*

■ Hesston's second challenge to count I presents a much more vexing issue—namely, whether the conduct complained of constitutes wholly past violations or present and ongoing violations of RCRA. Relying on *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), and its progeny, Hesston contends that count I is predicated on

---

er any penalties because the citizen suit provisions only authorizes a district court to apply the civil penalty provisions of subchapter III not subchapter IX. Ordinarily, "a litigant who fails to raise an argument until his reply brief will be deemed to have waived that argument." *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 439 (7th Cir.1994). However, because it is absolutely clear from the language of the statute that the court is not authorized to apply the civil penalty provisions of subchapter IX, the court shall grant Hesston's motion to the extent that it seeks to strike Dydio's request for civil penalties.

3. 42 U.S.C. § 6991b(h)(7)(A) authorizes a state to exercise authority to undertake or cause owners to undertake corrective action with respect to petroleum releases if "(i) the Administrator determines that the state has the capabilities to carry out effective corrective actions and enforcement activities; and (ii) the Administrator enters into a cooperative agreement with the State setting out the actions to be undertaken by the State."

wholly past violations, and that a Subsection A citizen suit cannot be maintained when it is based on such past violations. Specifically, Hesston notes that the allegations of the complaint indicate that Hesston owned, operated and maintained the USTs at issue during a period ending July 10, 1975 and that the USTs were never used subsequent to that date. Compl. ¶¶ 3, 4. Thus, Hesston concludes, Dydio is seeking to bring an action based on wholly past acts. In response, Dydio maintains that the regulations promulgated under RCRA impose corrective action requirements upon the "owner" of a UST and that Hesston is the "owner" and is presently in violation of those regulations.[4]

The corrective action requirements promulgated under subchapter IX of RCRA "apply to all owners and operators of a UST system as defined in § 280.12 [except as otherwise provided in sections having no relevance to this case]." 40 C.F.R. § 280.10(a). Section 280.12 defines "owner" as follows:

> In the case of any UST system in use before November 8, 1984, but no longer in use on that date, any person who owned such UST immediately before the discontinuation of its use.

40 C.F.R. § 280.12(b). The complaint in this action explicitly alleges that Hesston was the last entity who owned the USTs at issue immediately prior to discontinuation of their use. Compl. ¶ 13. We accept this factual allegation as true; and, in the memoranda supporting its motion to dismiss, Hesston does not contend that it is not the statutorily defined owner of the USTs in question.

The release response and corrective action requirements for petroleum containing USTs are set out in Title 40, Subpart F, of the Code of Federal Regulations. 40 C.F.R. §§ 280.60–.67. Section 280.60 of Title 40 provides: "Owners and operators of petroleum ... UST systems must, in response to a confirmed release from the UST system, comply with the requirements of this subpart. ..." 40 C.F.R. § 280.60. Subpart F

imposes requirements upon owners regarding initial response, *id.* § 280.61; initial abatement measures, *id.* § 280.62; initial site characterization, *id.* § 280.63; free product removal, *id.* § 280.64; investigations for soil and ground water clean-up, *id.* § 280.65; and, corrective action plan, *id.* § 280.66. Dydio alleges that, "To date, [Hesston] has refused to undertake corrective action obligations as set forth at 40 CFR Part 280" and that, "By defendant's failure to undertake the actions set forth at 40 CFR Part 280, defendant is in violation of Resource Conservation or [sic] Recovery Act, 42 U.S.C. 6901 et seq." Compl. ¶¶ 21, 22.

Relying principally on *Gwaltney,* as well as *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149 (9th Cir.1989), and *Harris Bank Hinsdale, N.A. v. Suburban Lawn, Inc.,* 1992 WL 396295 (N.D.Ill.1992), Hesston contends that Dydio cannot maintain a Subsection A claim against it because it never used the subject USTs after July 10, 1975 and therefore "any release caused by [Hesston] as owner or operator of the tank occurred on or before July 10, 1975." Def.'s Mem.Supp.Mot. Dis. at 2.

At the outset, we observe that Hesston is plainly incorrect in asserting that any release it caused must have occurred prior to July 10, 1975. Such a conclusion simply does not follow from the fact that Hesston discontinued using the USTs on that date: effects are frequently removed by some time from their causes. But this is all beside the point, because the essence of Dydio's claim is not that Hesston violated RCRA by causing a release; rather, it is that Hesston is presently violating RCRA by failing to take corrective action as is required by the regulations. In light of the definition of an owner provided at 40 C.F.R. § 280.12(b)—*viz.,* "any person who owned such UST immediately before the discontinuation of its use", it is clear to this Court that Hesston cannot avoid Dydio's claim simply by asserting that it discontinued

---

4. Most unfortunately, Hesston has completely failed to respond or otherwise join issue with the arguments raised in Dydio's response; instead, Hesston has cavalierly asserted that "[t]his straightforward issue has been adequately framed for the Court in the parties' briefs."

Def.'s Reply at 8. A party's responsibility, of course, goes beyond simply "framing" the issue; additionally, the party should shed some light on the picture by addressing the substantive merits of his or her opponent's arguments. This, Hesston has failed to do.

using the USTs and sold the property in 1975.[5]

*Gwaltney,* although standing for the broad proposition that Subsection A does not create a cause of action for wholly past violations sheds little light on the issue at hand. *Gwaltney* was a citizen suit brought under the Clean Water Act, whose pertinent citizen suit provision is materially identical to Subsection A. Between 1981 and 1984, the defendant in *Gwaltney* was alleged to have repeatedly violated the conditions of its National Pollutant Discharge Elimination System ("NPDES") permit—which authorized discharge of pollutants in accordance with specified conditions—by exceeding effluent limitations. The holder of a NPDES permit is subject to enforcement action by the Administrator for permit violations. Criminal, civil, and administrative sanctions are available to the Administrator as enforcement measures. If the Administrator (or a state enforcement agency) fails to exercise his or her enforcement responsibility, private citizens may commence a citizen suit against any person "alleged to be in violation of" the conditions of a NPDES permit. 484 U.S. at 53, 108 S.Ct. at 379 (quoting 33 U.S.C. § 1365(a)(1)). The defendant's last recorded discharge violation occurred in May 1984. Plaintiffs commenced a citizen suit in June 1984 alleging that defendant "has violated . . . [and] will continue to violate its NPDES permit." 484 U.S. at 54, 108 S.Ct. at 380. Defendant moved for dismissal for want of subject matter jurisdiction contending that the "in violation of" language of the Clean Water Act citizen suit provision, 33 U.S.C. § 1365(a)(1), required that the plaintiff must allege a violation occurring at the time the complaint is filed. The district court denied the motion and the Fourth Circuit affirmed, holding that the citizen suit provision could

be read " 'to comprehend unlawful conduct that occurred only prior to the filing of a lawsuit as well as unlawful conduct that continues into the present.' " 484 U.S. at 56, 108 S.Ct. at 380 (quoting 791 F.2d 304, 309 (4th Cir.1986)).[6] The Supreme Court vacated and remanded.

In reaching the conclusion that the "in violation language" is "forward looking," *id.,* 484 U.S. at 59, 108 S.Ct. at 382, the Court observed:

> the prospective orientation of that phrase could not have escaped Congress' attention. Congress used identical language in the citizen suit provisions of several other environmental statutes that authorize only prospective relief. See, *e.g.,* . . . Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6972. . . . Moreover, Congress has demonstrated in yet other statutory provisions that it knows how to avoid this prospective implication by using language that explicitly targets wholly past violations.

*Id.* at 57, 108 S.Ct. at 381. As an illustration of a statutory provision that targets wholly past violations, the Court explicitly identified 42 U.S.C. § 6972(a)(1)(B) ["Subsection B" of RCRA's citizen suit provision which authorizes suit against any "past or present" owner or operator of a storage facility "who has contributed or who is contributing" to the "past or present" storage of solid or hazardous waste—discussed in the next section of this opinion] and contrasted it with the prospective relief only language of Subsection A. *Id.* at 57 n. 2, 108 S.Ct. at 381 n. 2.

The Court further bolstered its conclusion that the "in violation of" language is prospective only by looking to the language and structure of the rest of the Clean Water Act

---

**5.** Additionally, we further note that it is unclear from the complaint when the leaking alleged in this suit began. The complaint merely indicates that the tanks were determined to be leaking in 1994. Compl. ¶ 8. It is entirely possible on the present record, that the evidence will establish that the tanks began leaking while Hesston was still in actual possession of the property and the tanks.

**6.** As an alternative basis for its holding, the district court held that the plaintiff satisfied the

jurisdictional requirements of the citizen suit provision because the complaint alleged in good faith that defendant was continuing to violate its permit at the time the suit was filed. 484 U.S. at 55, 108 S.Ct. at 380. The Fourth Circuit did not reach this issue. *Id.* at 56, 108 S.Ct. at 380. In the end, the Supreme Court remanded the case precisely for a determination of whether the complaint contained good faith allegations of an ongoing violation. *See* 484 U.S. at 65–67, 108 S.Ct. at 385–87.

as well as its legislative history. Much of the Court's discussion concerning the language of the Clean Water Act is equally apropos here. *See id.* at 59–60, 108 S.Ct. at 382–83. In this regard, the Court reasoned that the role of the citizen suit is entirely supplementary to the Administrator's primary enforcement responsibility and that "[p]ermitting citizen suits for wholly past violations of the Act could undermine the supplementary role envisioned for the citizen suit." *Id.* at 60, 108 S.Ct. at 383. In particular, the Court hypothesized that the threat of a citizen suit for civil penalties could undermine the Administrator's ability to work out corrective action settlements with violators thereby limiting the Administrator's ability to enforce the Act in the public interest. *Id.* at 60–61, 108 S.Ct. at 383.

To the extent that Hesston relies on *Gwaltney* for the proposition that Subsection A does not permit suits based on wholly past violations, the Court agrees. However, that rather limited proposition does not take us very far in resolving the issue that is presented to the Court—*viz.*, whether Dydio has properly alleged an ongoing violation that can support a claim under Subsection A; and, *Gwaltney* is of no assistance in that regard. There is no indication whatsoever in *Gwaltney* that the defendant was alleged to be in violation of ongoing corrective action requirements. Therefore, *Gwaltney* is of no assistance to Hesston.

Nor does *Ascon,* provide much support for Hesston's position. In *Ascon,* the plaintiff brought a citizen suit under Subsection A after discovering that hazardous waste had been deposited on property it subsequently purchased. The defendants were the alleged generators and transporters of the waste deposited on the property. All of the waste dumpings alleged in the complaint occurred four years before RCRA was passed and the district court dismissed the suit because the alleged activity occurred before the enactment of RCRA. Relying on *Gwaltney,* the Ninth Circuit affirmed, holding that Subsection A does not impose retroactive liability. *Ascon,* 866 F.2d at 1159.

We note initially that Hesston paints with too broad a brush when it cites *Ascon* for the proposition that "Congress did not intend RCRA to have a retroactive effect." Def.'s Mem.Supp.Mot.Dis. at 3. *Ascon* teaches only that Subsection A is not available to remedy past violations; that is, that a proper defendant in a Subsection A suit must not solely have violated RCRA in the past but must currently be "in violation" of RCRA. It is evident from the regulatory definition of an owner—and the fact that RCRA's regulations plainly apply to USTs no longer in use as of November 1988—that RCRA contemplates reaching those who have owned USTs in the past and imposes present requirements and duties upon them. *Cf. United States v. Northeastern Pharmaceutical & Chem. Co.,* 810 F.2d 726, 737–42 (8th Cir. 1986) (holding that actions brought by the Administrator under § 6973(a) may impose liability for acts of disposal predating the effective date of RCRA), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987).

It is not at all clear from the *Ascon* opinion what regulations or even what subchapter of RCRA the plaintiffs alleged the defendants to have violated. There is no indication that the suit even involved USTs, and therefore, it does not appear that the suit involved the regulations promulgated under subchapter IX as in the instant suit.[7] More significantly, there is no indication that the regulations involved imposed any present duties upon past generators or transporters equivalent to the corrective action requirements imposed on past owners of USTs under subchapter IX. Thus, again, *Ascon* sheds little light on the issue presented by this case—namely, whether failure to take corrective action as required by owners under 40 C.F.R. Subpart F constitutes a present violation of the regulations.

Although *Ascon* is readily distinguishable from the case at hand, *Harris Bank* presented precisely the issue we now confront. In *Harris Bank,* the plaintiff sued the defendant for its allegedly improper handling of USTs on property sold to the plaintiff's debt-

---

**7.** Because the suit was directed against generators and transporters of hazardous waste it would appear that the suit involved subchapter III and the regulations promulgated thereunder.

or and subsequently acquired by the plaintiff by deed in lieu of foreclosure. The defendant owned and operated four USTs on the property before selling it to plaintiff's debtor. In May 1989, the defendant removed three of four USTs; it did not report any release of petroleum during the removal nor did it perform any investigation or remediation of any release. Shortly, thereafter, defendant sold the property to plaintiff's debtor. After the plaintiff acquired the property, it removed the fourth UST and conducted a subsurface investigation of the tank area. During the course of this investigation, substantial gasoline contamination was discovered. Thereafter, plaintiff brought suit against the former owner under, *inter alia*, Subsection A, alleging that the defendant violated RCRA when it failed to register the tanks, failed to notify the EPA, and failed to take corrective action. Following *Gwaltney*, the *Harris Bank* court found that the "in violation of" language of Subsection A does not create a cause of action for wholly past violations and that "[a] citizen suit based on an 'in violation of' provision must contain allegations of either ongoing or intermittent violations to state a claim." 1992 WL 396295 at *2. The court proceeded to dismiss the Subsection A claim, stating:

> the allegations of Count I are violations of duties that apply only to owners or operators of underground storage tanks; Harris Bank's complaint clearly alleges that Suburban Lawn is no longer either an owner or an operator of the tanks. Moreover, all of the allegations are made in the past tense. Because the allegations only in-

volve past violations, Count I fails to state a claim for which relief may be granted.

*Id.* (citations omitted).[8] Although the plaintiff contended that the Subsection A count alleged continuing violations "because the complaint alleges that Suburban Lawn had a duty to register the tanks and has never done so and that Suburban Lawn never has complied with its duty to report and respond to a release," *id.*, the court rejected this argument, asserting simply that "classifying the wholly past violation of a duty as an ongoing violation is contrary to the Supreme Court's reasoning in *Gwaltney*." *Id.*

*Harris Bank* is distinguishable from the present suit in one critical respect: The court's holding in *Harris Bank* was fundamentally predicated on the finding that Suburban Lawn was not the "owner" of the USTs—"Harris Bank's complaint clearly alleges that Suburban Lawn is no longer either an owner or an operator of the tanks" *id.*; consequently, the court did not consider whether Suburban Lawn's failure to take corrective action constituted an ongoing RCRA violation. Whether the court's finding in this regard was correct is open to question[9]; in any event, in the instant suit, the allegations clearly define Hesston as the "owner" subject to the corrective action regulations of 40 C.F.R. Subpart F. Because *Harris Bank* never explicitly addressed the issue squarely presented to this Court, we do not consider it controlling.

■ Although Dydio's allegations unquestionably derive from Hesston's past conduct in the sense that Hesston's alleged obligation

---

8. No appeal was taken from *Harris Bank* and the Seventh Circuit has never spoken on this issue.

9. It is not entirely clear when the USTs involved in *Harris Bank* ceased to be "in use." The opinion only states that three of the four tanks were removed in May 1989. If the tanks ceased to be in use sometime before November 8, 1984—but simply were not removed until May 1989—then it would appear that Suburban Lawn was, in fact, the "owner" of the tanks as defined by the regulations and the court was mistaken in concluding that Suburban Lawn was not the "owner" subject to the corrective action regulations. However, if the tanks were in use on or after November 8, 1984, then § 280.12 of the regulations defines "owner" as "any person who owns

an UST system used for storage, use, or dispensing of regulated substances." 40 C.F.R. § 280.12(a). Arguably, even under this definition, Suburban Lawns might be deemed an owner of the USTs in question and the court erred in not regarding Suburban Lawns as such. However, an argument could be made that because the definition speaks in the present tense—"any person who owns an UST used for storage"—the definition does not cover previous owners such as Suburban Lawns. If that view were correct, the definition of "owner" would appear to leave a gap with respect to USTs in use on or after November 8, 1984, that (1) are on property subsequently sold by the owner, or (2) were subsequently put out of use prior to a release.

to take corrective action derives from its prior commercial operations, this does not render its alleged present failure to undertake corrective action a wholly past violation. The language of Subsection A indicates that a citizen suit may be brought against "any person ... who is alleged to be in violation of *any* ... regulation ... which has become effective pursuant to this chapter." 42 U.S.C. § 6972(a)(1)(A). Hesston has not attempted to argue that the corrective action regulations invoked by Dydio do not fall within the ambit of this language; and, we find no reason to conclude that they do not. Nor has Hesston attempted to avoid the language of 40 C.F.R. § 280.12(b) and § 280.10(a) under which Hesston could be found to be an "owner" of the USTs in question and subject to the corrective action requirements. This Court does not regard Dydio's allegations as simply classifying a wholly past violation as an ongoing violation; instead, we find that the regulations promulgated under subchapter IX create a regime under which past owners of USTs have continuing obligations to take corrective action following the confirmed release of a regulated substance, and that Dydio has properly alleged a present violation of those regulations. Accordingly, Hesston's motion to dismiss count I on the ground that it alleges a wholly past violation is denied.

## HESSTON'S CHALLENGE TO COUNT II

■ In Count II, Dydio brings a citizen suit pursuant to 42 U.S.C. § 6972(a)(1)(B) which provides in pertinent part:

§ 6972 **Citizen suits**

**(a) In general**

Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—

[1](B) against any person ... and including any ... past or present owner or operator of a treatment, storage, or disposal facility, who has contributed ... to the past or present handling, storage, treatment, transportation or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment[.]

42 U.S.C. § 6972(a)(1)(B) (hereinafter "Subsection B").

Tracking the reasoning in *Winston v. Shell Oil Co.,* 861 F.Supp. 713 (C.D.Ill.1994), Hesston contends that Dydio's claim under Subsection B must be dismissed because that subsection authorizes citizen suits against persons who have stored "solid or hazardous waste" and leaking petroleum does not constitute "solid or hazardous waste." Hesston maintains that petroleum is a useful product, not a waste, and therefore does not fall within the reach of Subsection B. Following the court's holding in *Winston,* Hesston argues that because § 9001 of RCRA defines petroleum as a "regulated substance," *see* 42 U.S.C. § 6991(2), Congress intended to exclude petroleum from RCRA's definition of solid or hazardous waste and to regulate petroleum exclusively under subchapter IX of RCRA. *See Winston,* 861 F.Supp. at 716. Hesston further maintains that subchapter IX does not allow citizen suits. For the reasons that follow, this Court disagrees.

Hesston relies exclusively on *Winston* as authority in support of the foregoing arguments; indeed, all other courts to address the issue have reached a contrary conclusion. *See e.g., Agricultural Excess & Surplus Ins. Co. v. A.B.D. Tank & Pump Co.,* 878 F.Supp. 1091 (N.D.Ill.1995); *Craig Lyle Ltd. Partnership v. Land O'Lakes, Inc.,* 877 F.Supp. 476 (D.Minn.1995); *Zands v. Nelson,* 779 F.Supp. 1254 (S.D.Cal.1991), *modified,* 797 F.Supp. 805 (S.D.Cal.1992); *Dominick's Finer Foods, Inc. v. Amoco Oil Co.,* 1993 WL 524808 (N.D.Ill. Dec. 15, 1993). Hesston, of course, urges this Court to adopt *Winston's* reasoning and conclusion. However, we decline to follow *Winston* because, although it is a well reasoned opinion, we respectfully believe it misinterpreted *Edison Elec. Institute v. U.S. E.P.A.,* 2 F.3d 438 (D.C.Cir.1993), upon which it principally relies.

In *Edison,* the court was called upon to decide whether the Environmental Protection Agency violated RCRA by temporarily deferring application of certain regulations (for identifying solid wastes as hazardous) promulgated under subchapter III of RCRA to petroleum contaminated soils resulting from leaking underground storage tanks.

*Edison,* 2 F.3d at 443, 451. Specifically, an environmental group (the Natural Resources Defense Council—"NDRC") charged that the EPA's decision to defer regulation of UST waste under subchapter III violated the clear mandate of that subchapter, which contemplated regulation of "all hazardous wastes" with no provision for deferrals. *Id.* at 451–52. The Court of Appeals for the D.C. Circuit noted that a potential regulatory problem was created "—unless EPA's temporary deferral is lawful—because Subchapter [III] operates to define petroleum as a hazardous waste," and the definition of a regulated substance under Subchapter IX expressly includes petroleum. *Id.* at 452. The court further explained:

> EPA deferred regulation of UST waste under Subchapter [III] on the ground that such waste is already regulated under Subchapter [IX] of RCRA, and concurrent imposition of Subchapter [III] requirements could, if the two regulatory regimes are not carefully coordinated, seriously interfere with ongoing hazardous waste monitoring, treatment, and cleanup.

*Id.* In light of this potential problem, and because "Congress did not clearly address the interaction of Subchapters [III and IX] in the context of petroleum wastes, *id.,* the court upheld the EPA's temporary deferral of regulating petroleum under subchapter III.[10] The *Edison* court specifically noted that the EPA's integration strategy did not "override" regulation of petroleum under subchapter III, and that the temporary deferral was lawful precisely because it was only a temporary "waystation on the road to permanent accommodation of the two Subchapters." *Id.* at 453.

It should be evident from the foregoing that the *Winston* court fundamentally mis-construed *Edison* when it stated that the question confronting the D.C. Court of Appeals was "whether petroleum is a regulated or a hazardous substance," *Winston,* 861 F.Supp. at 716–17, and when it determined that the *Edison* court concluded that "petroleum, although it could be defined as a hazardous substance under subchapter III, ... is a 'regulated substance' covered solely by subchapter IX." *Id.* at 717. The *Edison* court was not called upon to make a dichotomous determination as to "whether petroleum is a regulated or hazardous substance" nor did it conclude that petroleum was a regulated substance covered solely by subchapter IX. *Edison*'s only holding even remotely relevant to the issue at hand was that the EPA acted lawfully in temporarily deferring regulation of UST petroleum waste under subchapter III because Congress nowhere prohibited such deferral and "substantial administrative difficulties would arise if the Agency could not do so." *Edison,* 2 F.3d at 452–53 (concluding that it is "reasonable and proper for [EPA] temporarily to defer Subchapter [III] regulation"). Moreover, it is significant to note that the explicit premise underlying the *Edison* opinion was that petroleum may be defined as *both* a hazardous waste under subchapter III and a regulated substance under subchapter IX, *see Edison,* 2 F.3d at 452 (noting that "Subchapter [III] operates to define petroleum as a hazardous waste" and that the two subchapters "overlap with respect to petroleum wastes"); for, if the categorization of petroleum was of the dichotomous "either or" type envisioned by the *Winston* court, then there would be no overlap between subchapters III and IX and it would have been unnecessary for the EPA to defer regulating UST petroleum waste under subchapter III.[11] Furthermore, the

---

10. Specifically, the court determined that the EPA's temporary deferral was the product of a "permissible construction" of 42 U.S.C. § 6905(b)(1) which provides that the EPA "shall integrate all provisions of [RCRA] for purposes of administration and enforcement and shall avoid duplication, to the maximum extent practicable, with the appropriate provisions of ... such other Acts of Congress as grant regulatory authority to the administrator." 2 F.3d at 452. The court concluded that, because of the "overlap with respect to petroleum wastes," the EPA needed to temporarily defer regulation under subchapter III in order to coordinate regulation under the two subchapters. *Id.* at 452–53.

11. Admittedly, it is not clear from the opinion how the *Edison* court reached the conclusion that petroleum-contaminated soil from leaking USTs constitutes "hazardous waste." It does seem clear that this is the position taken by the EPA: "EPA contends that the plain language of RCRA causes Subchapter [III] and Subchapter [IX] to overlap in the regulation of petroleum waste such as UST waste." 2 F.3d at 452. Although it is sufficient for our purposes to con-

*Edison* court's recognition that UST petroleum waste can and must be regulated under *both* subchapters is evident from its rejection of the NRDC's charge that the EPA was impermissibly overriding subchapter III by exempting UST petroleum waste from regulation under that subchapter:

> The NRDC's point would have more force behind it had EPA purported permanently to exempt UST waste from Subchapter [III] regulation. ... Indeed, the temporary deferral is justified precisely and only because it is a waystation on the road to a permanent accommodation of the two Subchapters.

*Edison*, 2 F.3d at 453.

Thus, to the extent that the *Winston* court relied on *Edison* in concluding that petroleum is a "regulated substance"—and, therefore, not a solid or hazardous waste—and that regulation of leaking petroleum from USTs falls exclusively under subchapter IX, we respectfully conclude that *Winston* misread *Edison* and we decline to follow it.

The majority of courts confronting the issue have concluded that petroleum is a solid waste and that citizen suits may be brought under Subsection B against persons who have contributed to the handling, storage, etc. of petroleum in such a manner as to present an imminent and substantial endangerment to health or the environment. *See, Agricultural Excess & Surplus Ins. Co. v. A.B.D. Tank & Pump Co.*, 878 F.Supp. 1091 (N.D.Ill.1995); *Craig Lyle Ltd. Partnership v. Land O'Lakes, Inc.*, 877 F.Supp. 476 (D.Minn.1995); *Paper Recycling, Inc. v. Amoco Oil Co.*, 856 F.Supp. 671 (N.D.Ga. 1993); *Zands v. Nelson*, 779 F.Supp. 1254

(S.D.Cal.1991), *modified*, 797 F.Supp. 805 (S.D.Cal.1992); *Dominick's Finer Foods, Inc. v. Amoco Oil Co.*, 1993 WL 524808 (N.D.Ill. Dec. 15, 1993).[12] Most, if not all of these courts, have reiterated and adopted the reasoning originally set out in *Zands*, and today we join among them and hold that leaking petroleum is a solid or hazardous waste supporting a citizen suit under § 6972(a)(1)(B). The brief discussion that follows is derived from *Zands*, as well as *A.B.D. Tank & Pump* and *Land O'Lakes*, both of which relied on *Zands*.

RCRA defines "solid waste" as including "any ... discarded material, including ... liquid ... material resulting from ... commercial ... operations." 42 U.S.C. § 6903(27). *See also* 40 C.F.R. § 261.2(a)(1) (defining "solid waste" as "any discarded material" that is not otherwise excluded). Remarkably, RCRA does not define "discarded"; however, the regulations promulgated under RCRA, identifying those solid wastes that are subject to regulation as hazardous wastes, defines discarded material as including any material that is "abandoned." 40 C.F.R. § 261.2(a)(2)(i). "Materials are solid waste if they are *abandoned* by being [d]isposed of." 40 C.F.R. § 261.2(b)(1). RCRA defines "disposal" as meaning:

> the discharge, deposit, injection, dumping, spilling, *leaking*, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment....

42 U.S.C. § 6903(3) (emphasis added).

As the *Zands* court and others, *see U.S. v. Self*, 2 F.3d 1071, 1077 n. 3 (10th Cir.1993),

---

clude—which we do—that leaked petroleum constitutes a solid waste, we observe that 40 C.F.R. § 261.4(b)(10), which defines "[p]etroleum-contaminated media and debris that fail the test for the Toxicity Characteristic of § 261.24 ... and are subject to the corrective action regulations under part 280 of his chapter" as "solid waste[ ] which [is] not hazardous waste[ ]," suggests that such media constitutes a hazardous waste where the Toxicity Characteristic Rule is met.

**12.** Additionally, we observe—without placing any weight on the observation—that there are a number of cases involving citizen suits brought under Subsection B arising out of UST petroleum leaks. These cases have proceeded under the implicit

recognition that leaked petroleum constitutes either solid or hazardous waste. *See e.g., KFC Western, Inc. v. Meghrig*, 49 F.3d 518 (9th Cir. 1995); *First San Diego Properties v. Exxon Co.*, 859 F.Supp. 1313 (S.D.Cal.1994); *Buggsi, Inc. v. Chevron U.S.A., Inc.*, 857 F.Supp. 1427 (D.Ore. 1994); *Triffler v. Hopf*, 1994 WL 643237 (N.D.Ill. Nov. 4, 1994). At the same time, we note, however, that Dydio has overstated the holdings of *KFC Western* and *Triffler* in asserting that these courts addressed the issue and held that petroleum leakage constitutes a waste. *See* Pl.'s Resp. Mot.Dis. at 5 & n. 1. The issue was never directly addressed in these opinions.

have observed, at this point, the chain of definitions becomes circular: "solid waste is defined as the leaking of any solid waste." *Zands*, 779 F.Supp. at 1262. Faced with this definitional dead-end, the *Zands* court fell back on RCRA's broad definition of solid waste as "any discarded material" in concluding that leaking petroleum constitutes a solid waste under the statute, noting "the Court finds it difficult to believe that Congress intended that soil and groundwater contaminated with gasoline would not be covered by RCRA simply because the contamination was caused by gasoline." *Id.* at 1262.

In reaching this conclusion, the court specifically rejected the contention—advanced here by Hesston—that RCRA does not cover leaking gasoline because it is a useful product rather than a waste material. After acknowledging that gasoline is indeed a useful product when properly stored and transferred to a consumer, the court observed:

> It is equally clear, however, that gasoline is no longer a useful product after it leaks into, and contaminates, the soil. At this point, the gasoline cannot be re-used or recycled. As a result, it must be said that the gasoline has been abandoned via the leakage (even if unintentional) into the soil. Indeed, the Court is of the opinion that by including the word "leaking" in its definition of the word "disposed," the statute incorporates this change in usefulness.

*Id.* We concur with and adopt this reasoning. *See also Land O'Lakes*, 877 F.Supp. at 482 (agreeing with *Zands* on this point and adding that "leaked or spilt petroleum cannot be used for its intended purpose. Moreover, petroleum left behind from commercial operations comports with being abandoned. Accordingly, the court holds that spilt or leaked petroleum resulting from commercial operations satisfies RCRA's definition of 'solid waste'"); *A.B.D. Tank*, 878 F.Supp. at 1095 (agreeing with *Zands* that "leaked gasoline from an underground storage tank is no longer useful and is appropriately defined as discarded material or solid waste" and adding, "In all likelihood, Congress did not intend that soil and groundwater contaminated by gasoline should escape the RCRA's coverage simply because the contamination was

caused by a product which was at one time useful"); *Dominick's Finer Foods*, 1993 WL 524808 at *2.

As noted by the court in *Land O'Lakes*, the conclusion that petroleum-contaminated soil constitutes "solid waste" is further buttressed by the fact that 40 C.F.R. § 261.4(b)—entitled *"Solid wastes which are not hazardous wastes"*—includes "petroleum-contaminated media and debris." 40 C.F.R. § 261.4(b)(10); *see Land O'Lakes*, 877 F.Supp. at 480 n. 4. Plainly, this provision presupposes that petroleum contaminated material is a solid waste in the first instance.

■ Finally, we concur with *A.B.D. Tank* that even if leaking petroleum from a UST is also considered a regulated substance covered by subchapter IX, as was held by the *Winston* court, that fact does not compel the conclusion that citizen suits under Subsection B are precluded. While subchapter IX only explicitly provides for the Administrator to issue orders requiring compliance with the subchapter and authorizes the Administrator to bring a civil action to enforce such orders, nothing in subchapter IX indicates that that subchapter was intended to provide the exclusive remedy for petroleum leaks from USTs. *See A.B.D. Tank*, 878 F.Supp. at 1095–97. Section 6972, which authorizes citizen suits under RCRA, plainly recognizes the authority of the Administrator to issue orders and to bring civil actions, pursuant to § 6973, where the handling, storage, etc. of solid waste presents an imminent and substantial endangerment to health or environment. *See* 42 U.S.C. § 6972(b)(2)(B). Indeed, § 6972(b)(2)(B) prohibits commencement of a citizen suit under Subsection B where the Administrator has initiated such an action or issued such an administrative order. *See* 42 U.S.C. § 6972(b)(2)(B)(i), (iv). Yet nowhere does § 6972(b), which delineates the circumstances under which citizen suits are prohibited, indicate that citizen suits are precluded merely by virtue of the fact that the suit involves leaking petroleum regulated under subchapter IX. As is evidenced by subsections (b)(2)(B)(i) and (iv), Congress knows how to explicitly preclude citizen suits and to give exclusive remedial authority to the Administrator when it so

chooses; it has not chosen to do so with respect to actions stemming from USTs leaking petroleum. Accordingly, we hold that subchapter IX does not preclude citizen suits brought under Subsection B.[13]

For all of the foregoing reasons, Hesston's motion to dismiss count II is denied.

## CONCLUSION

Defendant Hesston Corporation's motion to dismiss plaintiff's complaint is denied in part and granted in part. To the extent that Hesston asks this Court to strike Dydio's request for civil penalties, the motion is granted. It is denied in all other respects. Hesston is directed to answer the complaint by June 12, 1995. Dydio's motion to file a surreply is denied as moot.

---

13. We also note that the argument advanced by Hesston that subchapter IX precludes citizen suits under § 6972 because it only authorizes the Administrator to bring suit for violations, *see* Mem.Supp.Mot.Dis. at 9, would also be applicable to suits brought under Subsection A; however, the plain language of Subsection A reveals the flaw in the argument. Under Subsection A, a citizen suit may be brought against persons alleged to be in violation of any regulation, order, etc. "which has become effective pursuant to this *chapter.*" 42 U.S.C. § 6972(a)(1)(A) (emphasis added). On its face, such suits may be brought to enforce subchapter IX. If Congress intended to exclude subchapter IX, it either would not have used the all inclusive phrase "under this chapter" or it would have explicitly provided for subchapter IX's exclusion under § 6972(b) or (c).