**AURORA NATIONAL BANK, as Trustee of Trust No. 53, and Margaret Wollwert and Hazel Wollwert, as Beneficiaries of Trust No. 53, Plaintiffs,**

v.

**TRI STAR MARKETING, INC., an Illinois corporation, Marathon Petroleum Company, an Ohio corporation, and Lincoln Land Oil Company, an Illinois corporation, Defendants.**

No. 96 C 4175.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 15, 1998.

---

Stephen Douglas Sharp, Chicago, IL, Ann T. Parisi, Maureen Martin, Johnine J. Brown, BrownMartin, P.C., Chicago, IL, for Plaintiffs.

Richard Lewis Reinish, D'Ancona & Pflaum, Chicago, IL, Roy G. Davis, David G. Lubben, Davis & Campbell, L.L.C., Peoria, IL, Peter Robert Sonderby, P.C., Chicago, IL, for Defendants Tri Star Marketing, Inc., Marathon Petroleum Co.

Edward V. Walsh, III, Sachnoff & Weaver, Ltd., Chicago, IL, for Defendant Lincoln Land Oil Co.

### MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Plaintiffs Aurora National Bank, as Trustee of Trust No. 53, and Margaret Wollwert and Hazel Wollwert, as beneficial owners of Trust No. 53 (property owners), originally brought this action against defendants Tri Star Marketing, Inc. (Tri Star), Marathon Petroleum Company (Marathon), and Lincoln Land Oil Company (Lincoln). In their complaint plaintiffs sought declaratory and injunctive relief under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901 *et seq.*, for alleged violations stemming from defendants' involvement in the operations of a gasoline service station on property that was leased from plaintiffs (Counts I–VI). Plaintiffs also invoked this court's supplemental jurisdiction under 28 U.S.C. § 1332 to make various state law claims for relief (Counts VII–XI).

On May 15, 1997, this court issued a minute order asking the parties to submit statements of position in order to narrow the legal and factual issues with respect to plaintiffs' RCRA claims. Specifically, the parties were asked to address the following issues: (1) whether some or all of the named defendants are liable for taking corrective action with regard to the petroleum discovered to be present in the soil, backfill and groundwater at plaintiffs' property; (2) whether additional parties need to be added as defendants; and (3) whether it is plaintiffs' or defendants' burden to prove which defendants, if any, are responsible for the contamination. After reviewing the parties' statements it is clear that they are no closer to agreement on any of these issues than they were before. For this reason we here attempt to sort out, as best we can, what happened, when it happened, and where that legally leads—not necessarily conclusively, but in all probability. We will therefore evaluate the parties' arguments as we would if we were reviewing them on a motion for summary judgment.

### BACKGROUND

Because we are evaluating the parties' positions as if they had been presented on a motion for summary judgment, the facts recited herein are undisputed unless otherwise indicated. Plaintiff Aurora is a national banking corporation with its principal place of business in Aurora, Illinois. Aurora is

trustee of Trust No. 53, a land trust that owns a tract of land located at 702 North Broadway, Aurora, Illinois (property). Aurora became the trustee of the property pursuant to a land trust agreement dated August 18, 1958. Plaintiffs Margaret Wollwert and Hazel Wollwert are the beneficial owners of Trust No. 53. Defendant Tri Star is an Illinois corporation with its principal place of business in Urbana, Illinois. Defendant Marathon is an Ohio corporation licensed to do business in Illinois. Defendant Lincoln is an Illinois company with its principal place of business in Springfield, Illinois. Lincoln was formerly known as Chronister Oil Company (hereinafter "Chronister" will refer to Lincoln and its predecessors).

At issue in this case is assigning liability under the RCRA for remediating contamination on plaintiffs' property. In 1959, plaintiff property owners leased the property to North States Oil, a now defunct company not a named defendant in this lawsuit. North States Oil operated a gas station on the property from 1959 until September 30, 1981. In 1959, North States Oil installed three steel gasoline underground storage tanks (USTs) on the property that were in existence until 1989. According to plaintiffs there was also a kerosene UST in place on the property during the tenancy of North States Oil.

On October 17, 1979, the property owners entered into the prime lease with North States Oil, under which all subsequent lessees were obligated. The prime lease made the lessee liable for property damage and required it to carry insurance against property damage in the amount of at least $100,000. It provided that

> [a]t the termination of this lease or any extension thereof, all buildings, improvements, changes, and additions upon the premises shall remain and become the property of Lessor, excepting such trade fixtures as Lessee can remove without injury to the premises. It being agreed that upon the removal of such trade fixtures, the premises shall be placed by Lessee in the condition in which they were prior to the affixing of such trade fixtures to the premises.

(Cplt. Ex. 1, ¶ 6).

Chronister took an assignment of sublease from North States Oil on October 29, 1979, and operated a gasoline station on the property from October 29, 1979, to October 1, 1981. Plaintiffs allege that Chronister used the four USTs (three gasoline, one kerosene) that North States installed, although defendants dispute that the kerosene UST was on the property when Chronister took over the lease. During Chronister's tenancy it undertook substantial alterations of the property. Plaintiffs allege that Chronister relocated the dispenser islands and installed new piping to connect the USTs to the dispenser islands. The old piping was disconnected but not removed. Defendants agree that Chronister disconnected and replaced the old lines (which they claim were never used by Chronister) running from the USTs to the service islands. They also agree that the old lines were not removed from the ground, and assert that the reason for the installation of new lines was that there were problems with the old lines. They further state that Chronister replaced the pumps and dispensers and added a new canopy over the site. Finally, defendants state that Chronister tested its new tanks and lines and found that there were no leaks.

Marathon took an assignment of sublease from Chronister on October 1, 1981, and an assignment of the prime lease from North State Oil's shareholders on March 15, 1982. Plaintiffs allege, and defendants do not dispute, that Marathon did not operate the gasoline station during this time, instead engaging Tri Star to do so.

Tri Star took an assignment of sublease from Marathon on December 1, 1985. Tri Star operated the gasoline station until sometime before June 1, 1992, when it vacated the property. Tri Star states that when it took over the property it immediately implemented its system for detecting product loss. It hired an independent firm to periodically test the tanks and the lines for tightness. During Tri Star's possession the tanks and lines were tested ten times, and each time the test revealed the system was "tight."

Tri Star removed the old steel USTs in 1989 and installed three new gasoline USTs made of fiberglass. Tri Star installed new

piping to connect USTs to the dispenser islands, but did not remove the oldest set of piping that Chronister had left in the ground, or the second set that Chronister installed. Tri Star's lease expired on June 30, 1991. The prime lease provided that the "rent for the first year of an extended term shall be the then fair, cash market rental value of the land only exclusive of improvements" (Cplt.Ex. 1, ¶ 2). According to plaintiffs, Tri Star held over for another year until June 30, 1992, in order to comply with its remediation obligations. During that time it paid the old rent of $1,000 per month, although plaintiffs allege that during negotiations Tri Star indicated it was prepared to pay $1,250 per month.

Before vacating the property in 1992, Tri Star removed the new fiberglass USTs and, according to plaintiffs, removed the kerosene UST as well. Tri Star states that when it excavated the USTs and vacated the property it attempted to investigate the nature and extent of any contamination and make any remediation efforts required by UST laws, including the RCRA and its implementing regulations, as well as the Illinois UST laws and regulations. *See* 415 ILCS § 5/57 *et seq.*, 35 Il.Admin.Code Parts 731, 732. Tri Star claims it was unable to fully comply with its UST obligations because plaintiffs would not allow further access to the property unless Tri Star agreed to make continued rent payments.

Petroleum contamination now exists in the soil, backfill, and groundwater at the property. Plaintiffs allege that contamination was discovered in the vicinity of the old piping that Chronister left behind, the second set of piping that Chronister installed, and the new piping that Tri Star installed. Plaintiffs also allege that contamination was found around the dispenser islands that Chronister installed and in the vicinity of the old steel USTs. Tri Star asserts that the area containing Tri Star's tanks was clean and petroleum product was only detected in the area of the lines in the pump islands. It further asserts that no contamination was found in the gravel surrounding the lines Chronister installed, although it concedes that contamination was detected by odor in the clay trenches.

Tri Star has offered to remediate the site in accordance with the Illinois EPA (IEPA) Leaking Underground Storage Tank (LUST) program. Plaintiffs have rejected this offer to the extent that it would relieve defendants of any responsibility for past and future rental payments or attorney fees incurred up to this point.

### DISCUSSION

Counts I through VI of plaintiffs' complaint were brought under the citizen suit provision of the Resource Conservation and Recovery Act (RCRA), which provides in relevant part as follows:

§ 6972. Citizen Suits

(a) In General

Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—

(1)(A) against any person ... who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter; or

(B) against any person ... and including any past or present generator, past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment....

42 U.S.C. § 6972(a)(1)(A) & (B). Section 6972(e) permits a successful plaintiff to recover its attorney fees and costs from the responsible party. 42 U.S.C. § 6972(e). Plaintiffs make claims for declaratory and injunctive relief under subsections (a)(1)(A) and (a)(1)(B), as well as for attorney fees and costs under § 6972(e).

### I. Liability for Violation of UST Laws and Regulations Under § 6972(a)(1)(A)

First, plaintiffs claim that defendant Tri Star is liable under § 6972(a)(1)(A) for failing to comply with federal and state UST laws and regulations effective pursuant to 42 U.S.C. § 6901 *et seq.* (Counts I–IV).[1] Al-

---

1. We note that in their complaint plaintiffs bring

their subsection (a)(1)(A) claims against both Tri

though subsection (a)(1)(A) does not permit a citizen suit for wholly past violations of the statute, *see Gwaltney v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 57, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), the continued presence of illegally dumped materials generally constitutes a "continuing violation" of the RCRA, which is cognizable under § 6972(a)(1)(A). *See Acme Printing Ink Co. v. Menard, Inc.*, 891 F.Supp. 1289, 1301–02 (E.D.Wis.1995).

Under federal UST regulations an "owner or operator" of UST systems must comply with certain monitoring, investigation, corrective action, and closure requirements. 40 C.F.R. § 280, Subparts E, F, G. A UST includes underground piping, not just the buried tank itself 42 U.S.C. § 6991(1). The definition of the term "owner" provides in relevant part as follows:

> (A) in the case of an underground storage tank in use on November 8, 1984, or brought into use after that date, any person who owns an underground storage tank used for the storage, use, or dispensing of regulated substances. . . .

42 U.S.C. § 6991(3)(A). "The term 'operator' means any person in control of, or having responsibility for, the daily operation of the underground storage tank." 42 U.S.C. § 6991(4). Under the closure provisions of Subpart G, an owner/operator of a UST must measure for the presence of a contamination release prior to permanently closing the site. 40 C.F.R. § 280.72. If contamination is discovered during this site assessment, an owner/operator must begin corrective action. 40 C.F.R. § 280.72.[2]

Plaintiffs claim that defendant Tri Star is liable under § 6972(a)(1)(A) as the owner and operator of USTs located on the property. Under the terms of the prime lease, pursuant to which Tri Star leased the property from December 1985 to June 1992, Tri Star owned all of the trade fixtures on the property, which, according to plaintiffs, included the USTs. Tri Star thus owned the old steel USTs, which it removed in 1989, and the new fiberglass USTs it installed that same year.

Tri Star also "operated" both the old and new USTs, as that term is defined in the RCRA. Tri Star does not appear to dispute these conclusions. In addition, Tri Star removed the old USTs in 1989 and the new USTs in 1992. Therefore, plaintiffs claim that as the owner and operator of the old and new UST systems, and the person responsible for closing both, Tri Star was required to comply with the relevant investigation and corrective action regulations. Plaintiffs contend that Tri Star's failure to do so subjects it to liability.

In response, defendant Tri Star argues that it cannot be held liable under § 6972(a)(1)(A) since it has made a good faith effort to comply with the applicable UST regulations, but has been prevented from doing so by plaintiffs' actions. Tri Star claims that it properly notified state officials before the removal of both the old and new USTs. When Tri Star detected petroleum contamination near the lines in the pump islands, it filed an incident report with the IEPA as directed by the fire marshal. Tri Star further claims that it offered and attempted to perform site investigations on the property in 1992, but was obstructed from doing so when plaintiffs' attorney asserted that Tri Star's lease had been terminated on June 30, 1992. After that date plaintiffs would not allow Tri Star access to the property to perform testing for contamination unless Tri Star agreed to continue paying rent, which it refused to do. Tri Star claims that it continues to stand ready to conduct required site investigations and take any corrective action required under applicable laws and regulations.

Plaintiffs rejoin that Tri Star has never made a good faith effort to comply with UST laws. They claim that Tri Star negotiated the holdover year of July 1, 1991–June 30, 1992 for the purpose of conducting site investigation and remediation, and then completely failed to do so. Because defendant failed to remediate when it had the opportunity to do so, plaintiffs contend that they should not

---

Star and Chronister. However, in their statement of position, plaintiffs confine this claim to Tri Star's conduct and we will, therefore, evaluate it accordingly.

**2.** Illinois UST laws track the RCRA definitions, 415 ILCS 5/57.2, and impose liability on UST owners and operators "for all costs of investigation, preventive action, corrective action and enforcement action. . . ." 415 ILCS 5/57.12.

now have to provide indefinite access to defendant and thereby forego all rental income during the remediation period.

We first note that it is clear that Tri Star was obligated under 40 C.F.R. § 280, Subpart G to investigate and take corrective action in conjunction with its closure of the USTs located on the property. There is no dispute that both the old and new USTs were removed from the property by Tri Star. There is also no dispute that contamination has been detected on the property in the vicinity of the USTs, piping, and relocated dispenser islands.

However, it is less clear whether Tri Star was relieved of its legal obligations by plaintiffs' conduct. The plain language of the statute does not help answer this question. Under § 6972(a), this court is simply authorized "to enforce the permit, standard, regulation, condition, requirement, prohibition, or order, referred to in paragraph (1)(A)." At first glance it would seem that a party in violation of applicable environmental regulations would be strictly liable to take appropriate actions to achieve compliance. Any dispute over issues such as the proper amount of rent to be charged during the compliance period would seem to raise a question that would need to be addressed separately between the parties. However, it is also true that the citizen suit provision of the RCRA only allows claims by parties "acting as private attorneys-general rather than [those] pursuing a private remedy." *Environmental Defense Fund, Inc. v. Lamphier*, 714 F.2d 331 (4th Cir.1983). Thus, if plaintiffs here have impeded the enforcement of environmental laws for their own financial advantage, they have not acted consistent with the purpose of the statute and a finding of liability would not be warranted.

It is obvious that the issue of whether Tri Star is liable for past and future rental payments has become the focal point of the § 6972(a)(1)(A) dispute. The parties' inability to agree on a fair rental value appears to have precipitated the termination of the lease, and plaintiffs' demand for additional rental payments upon any future clean-up efforts by Tri Star continues to stall remediation. As both parties acknowledge, Tri Star's financial responsibility for remediation would be limited since Tri Star's outlay

would be reimbursed by Illinois' UST insurance fund (although Tri Star would still incur a $10,000 deductible). The question, then, is whether Tri Star is using the threat of rental payments as an excuse for its failure to comply with the UST laws or whether plaintiffs are attempting to use the citizen suit provision to obtain unwarranted rental payments from Tri Star.

In order to resolve this issue it is necessary to look to the terms of the prime lease that governed the relationship between the parties and identify what occurred during the "holdover year." The prime lease, which was set to expire on June 30, 1991, contained a renewal clause that stated that "this Lease shall be automatically renewed and extended for two (2) additional ten (10) year periods, unless Lessee shall give to the Lessor ninety (90) days written notice to the contrary prior to the expiration of the initial term...." (Cplt.Ex. 1, ¶ 2). The prime lease provided that the "rent for the first year of any extended term shall be the then fair, cash, market rental value of the land only exclusive of improvements" (Cplt.Ex. 1, ¶ 2). The parties were to establish the rental value but, if they were unable to agree, the value was to be determined by three appraisers (Cplt.Ex. 1, ¶ 2). On February 22, 1991, Tri Star advised plaintiffs that it intended to "honor and accept the first ten year lease extension and will faithfully perform each and every lessee obligation under the assigned sublease" (Cplt.Ex. 11). It appears that Tri Star and plaintiffs could not come to a decision about the fair rental value and the lease was terminated on June 30, 1992. It is not clear exactly when Tri Star had notice of this termination or if Tri Star initially agreed to this termination. It is clear that in April 1992 Tri Star began taking steps to remove the USTs and conduct soil-testing on the property. Then, in a letter dated July 8, 1992, Tri Star acknowledged that the lease had been terminated on June 30 (Plfs. Reply Ex. 2). After this point Tri Star refused to continue with site remediation because plaintiffs were demanding additional rental payments.

■ We do not think that the information we possess permits us to make a definitive

judgment on whether plaintiffs would succeed in their § 6972(a)(1)(A) claim against Tri Star, since issues of fact remain. It is not clear whether Tri Star renewed the lease in 1991 simply in order to conduct UST closure and site-remediation, as plaintiffs contend. It appears that initially Tri Star did not intend to vacate the property, but either agreed or was forced to vacate when negotiations over rent broke down. In their complaint plaintiffs assert that Tri Star breached the prime lease by failing to complete the appraisal process provided for in that agreement. But it is not clear whether this is true, and, moreover, even if it were, we are not convinced that plaintiffs would have been justified in completely revoking the lease. If plaintiffs were not so justified and defendants were simply evicted on June 30, 1992, despite their good faith efforts to comply with UST laws, then we do not see how plaintiffs would be justified in now maintaining a citizen suit against Tri Star to enforce these very same UST laws (where the underlying intent would simply be to recover rental payments). If, on the other hand, Tri Star fully agreed to vacate the property by June 30, 1992, and knew that remediation needed to be completed before that date, then Tri Star's simple desire to not pay additional rental payment would not relieve it of liability. Tri Star would thus be obligated to incur the full costs of remediation, and the cost of accessing the site would have to be resolved as a separate issue.

Finally, we note that the issue of subsection (a)(1)(A) liability has taken on a larger significance not only because of Tri Star's potential exposure to liability for rental income, but also because of its potential responsibility for "litigation costs," including attorney fees, which this court may award to plaintiffs if it deems them the "prevailing or substantially prevailing party." 42 U.S.C. § 6972(e).[3] This issue may perhaps be the most important one since plaintiffs' attorney fees continue to mount, while the issues of rent and remediation costs present—at least relative to attorney fees—fairly fixed and manageable costs. Of course, the possibility that Tri Star would be responsible for plain-

tiffs' attorney fees would not excuse its failure to perform its legal duties under the UST laws. Therefore, we simply note here that we will treat the issues of liability and attorney fees separately. If, in the exercise of this court's discretion, we subsequently find that plaintiffs are the "prevailing or substantially prevailing party" within the meaning of § 6972(e), then Tri Star will be held accountable for plaintiffs' fees.

## II. Liability for Contributing to Solid Waste Disposal Under § 6972(a)(1)(B)

 Assuming that plaintiffs are unable to succeed in their claim under § 6972(a)(1)(A) against Tri Star, we evaluate plaintiffs' second claim that defendants are liable under § 6972(a)(1)(B) for contributing to an imminent and substantial endangerment within the meaning of that subsection (Counts V–VI). We note initially that the citizen suit provision of § 6972(a)(1)(B) is applicable in the instant case since the petroleum contamination discovered on plaintiff's property constitutes a "solid waste" within the meaning of the RCRA. See Waldschmidt v. Amoco Oil Co., 924 F.Supp. 88, 90–91 (C.D.Ill.1996); Agricultural Excess and Surplus Ins. Co. v. A.B.D. Tank & Pump Co., 878 F.Supp. 1091, 1097 (N.D.Ill.1995); Zands v. Nelson, 779 F.Supp. 1254, 1261–64 (S.D.Cal.1991) (Zands I); but see, Winston v. Shell Oil Co., 861 F.Supp. 713, 716 (C.D.Ill. 1994) (holding that plaintiffs could not bring citizen suit because petroleum USTs are exclusively regulated by Subchapter IX of the RCRA, which does not provide for citizen suits). In order to prevail under subsection (a)(1)(B) a plaintiff must show (1) that the solid or hazardous waste "may present an imminent and substantial endangerment to health or the environment"; (2) that the endangerment stems from "the handling, storage, treatment, transportation or disposal of any solid or hazardous waste"; and (3) that the defendant "has contributed or is contributing to such handling, storage, treatment, transportation or disposal." See Craig Lyle Ltd. Partnership v. Land O'Lakes, 877 F.Supp. 476, 480 (D.Minn.1995); United

---

3. We note that Chronister would also be subject to paying plaintiffs' attorney fees if it were found liable under § 6972(a)(1)(B), as discussed below.

This discussion of attorney fees therefore applies with equal force to Chronister.

*States v. Conservation Chemical Co.,* 619 F.Supp. 162, 199–200 (D.C.Mo.1985). Where the endangerment is indivisible, joint and several liability may be appropriate "to grant all relief necessary to ensure complete protection of the public health and the environment." *Conservation Chemical,* 619 F.Supp. at 199. Among other things, § 6972(a)(1)(B) permits the court to issue injunctions against any person found liable under its provisions and to order such a person to take a specific action to abate past contamination. Such an injunction may require a party to take responsibility for the remediation of a site contaminated by hazardous waste. *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 116 S.Ct. 1251, 1254, 134 L.Ed.2d 121 (1996).

The dispute between the parties here centers on the third element of the § 6972(a)(1)(B) test: whether plaintiffs can show that Tri Star and Chronister "contributed to" the solid waste disposal which is the source of the current contamination.[4] Although it is true that individuals are liable under RCRA without regard to fault or negligence, the "contributed to" language of subsection (a)(1)(B) has been held to " 'expressly specif[y] that there is no liability without a causal relationship between a defendant and an imminent and substantial endangerment.' " *Zands v. Nelson,* 797 F.Supp. 805, 809 (S.D.Cal.1992) (*Zands II* ) (quoting *United States v. Hardage,* 116 F.R.D. 460, 466 (W.D.Okla.1987)). While Congress intended that the phrase "contributing to" be interpreted liberally, *see United States v. Price,* 523 F.Supp. 1055, 1073 (D.N.J.1981), *aff'd* 688 F.2d 204 (3d Cir.1982), courts that have considered the issue have imposed limitations on the scope of potential liability. *See Zands v. Nelson,* 779 F.Supp. 1254, 1264 (S.D.Cal. 1991) (*Zands I* ) (stating that individuals who provide the materials for USTs, or who sell the land to individuals who install USTs, are not liable for "contributing to" an endangerment).

However, before we can evaluate whether defendants have "contributed to" the contamination at issue, we must first determine which theory of liability to apply to plaintiffs' § 6972(a)(1)(B) claims. This is a critical initial inquiry since what plaintiffs must show to establish that defendants have contributed to the petroleum leakages on the property varies, depending on whether plaintiffs are operating under a "general" or "alternative" theory of liability. *Zands II,* 797 F.Supp. at 812–18. Both parties recognize this dilemma and, pursuant to this court's request, have submitted briefs addressing the issues of burden-shifting, the joinder of additional defendants, and the appropriate standard for subsection (a)(1)(B) "contributing to" liability. These issues are obviously intertwined. In order to determine the appropriate standard of "contributing to" liability, we must first decide whether to invoke the burden-shifting approach set forth in *Zands II,* 797 F.Supp. at 813. In turn, the propriety of employing the burden-shifting approach is contingent upon the joinder of all potential contributing parties.

The case law discussing the parameters of liability under subsection (a)(1)(B) is sparse. In order to properly evaluate the parties' different contentions, we therefore look to what has emerged as one of the leading cases on this issue, *Zands II,* which contains a detailed explication of the "contributing to" standard. In *Zands II,* the court was faced with applying potential RCRA liability to a string of prior owners and operators of a gasoline station which had caused contamination during the tenure of some or all of their ownership periods. With regard to sorting liability among the previous and current owners and operators, the current owners of the property, Zands, alleged that all of the leakage of gasoline occurred prior to their purchase of the property, that they were not informed of the leakage prior to their pur-

---

4. Chronister does assert that plaintiffs cannot meet their burden of showing "imminent and substantial endangerment" (Lincoln Resp. at 5). However, defendant Chronister's main arguments in support of its contention—that plaintiffs are currently leasing the site to a flower business and that IEPA has taken no enforcement action—do not establish that an "imminent and substantial endangerment" does not exist.

Chronister seems to acknowledge this point, stating that "[d]etermining endangerment is a fact intensive inquiry" and that when plaintiffs are "put to their proof" they will not be able to make the requisite factual showing (Lincoln Resp. at 5). While this may indeed be the case, the existence of a factual dispute with respect to this issue would preclude resolving this case at the summary judgment stage.

chase of the gasoline station and therefore they were not liable under the RCRA.

The framework the court employed in resolving the plaintiffs' claims in *Zands II* is useful in sorting out the parties' claims in the case at hand. First, the *Zands II* court offered a general theory of liability under the contribution prong of § 6972(a)(1)(B). Specifically, the court held that as to prior owners or operators of the station, in order for any liability to attach it was necessary to prove that the defendants were the owners and operators when the gasoline leaked into the soil. *Zands II*, 797 F.Supp. at 810–11. In so holding, the court issued the following conclusions about the scope of contribution:

> [T]he Court holds that owners and operators contribute to the contamination if the contamination is the direct result of activities related to the operation of a gas station; plaintiffs need not prove the specific cause of the contamination. Clearly individuals who own or operate gas stations are responsible for gasoline that leaks from the piping system or the gas tanks themselves. Indeed, the direct relationship between the leakage and the equipment owned and operated for use at the gas station is sufficient to prove the element of "contribution."
>
> \* \* \* \* \* \*
>
> Of course, plaintiffs cannot prevail if they prove only that the defendants were the owners and operators of this gas station at some point in the past. Additionally, to hold these defendants responsible for the contamination, it is necessary to prove that the defendants were the owners and operators of the gas station *when* the gasoline leaked into the soil. The primary issue thus becomes: "When did the contamination occur?"
>
> \* \* \* \* \* \*
>
> [P]laintiffs may only hold defendants liable for *that portion* of the contamination that occurred prior to the transfer of the property to plaintiffs.

*Id.* (emphasis in original).

Therefore, in order to establish defendants' liability in this case under the general theory set forth in *Zands II*, plaintiffs would have to show that the contamination at issue is the "direct result" of defendants Chronis-

ter and Tri Star's activities and that specific amounts of leakage occurred during the periods when each of the defendants was operating the gasoline station. *Id.* Plaintiffs disagree that this is the appropriate standard for determining § 6972(a)(1)(B) liability. Instead, plaintiffs contend that the contribution standard requires this court to determine not whether defendants actually caused a release but whether a release occurred from the UST system they operated, whether that was while defendants operated it or someone else did. They assert that "plaintiff does not have to prove that the petroleum was released when the Defendant operated the USTs **but only that the Defendant operated the USTs from which the petroleum was released**" (Plfs. Reply at 12) (emphasis in original). We think that plaintiffs misapprehend the law on this point. As we discuss more fully below, the rule plaintiffs articulate is only valid where special conditions exist which make the specific allocation of fault between defendants impossible, and where plaintiffs comply with certain procedural requirements (which at this point they have not done). *See Zands II*, 797 F.Supp. at 817–18.

Plaintiffs cite *Triffler v. Hopf*, No. 92–C–7193, 1994 WL 643237, 1994 U.S. Dist. LEXIS 16158, \*8–13 (N.D.Ill. Oct. 31, 1994) (Plfs.Stmt.Ex.7), for the proposition that liability under the RCRA can be established simply by showing that "a release occurred from the UST system [Defendants] operated, whether that was while Defendants operated it or someone else did" (Plfs. Reply at 4). In that case, plaintiff, who operated an automobile dealership, had purchased property formerly used as a gas station, without knowing that it contained USTs. When plaintiff discovered the existence of the USTs and associated contamination, he filed an RCRA suit against the previous owners, one of which was Exxon. Exxon moved for summary judgment, arguing that plaintiff could not show that the contamination occurred while Exxon owned the property. The court denied Exxon's motion, *id.* at \*3, but in so doing seemed to disagree with the reasoning of the *Zands II* court. Specifically, the court held that plaintiff's failure to pinpoint precisely when the leakage occurred did not entitle Exxon to summary judgment since

"nothing in the plain language of the [RCRA] suggests that th[e] causal connection [between the liable party and the solid waste disposal] is magically severed by the past owner's sale of the property." *Id.* at *4.

But *Triffler* presented a different situation than we have here. In that case the court was dealing with a previous owner, Exxon, who had obviously operated a gasoline station on the property in question. No subsequent owner or lessee of the property, including plaintiff, ever used it as a gasoline station. Therefore, the fact that Exxon had allegedly sold the property before any leaks occurred, did not absolve it of responsibility since it was the only defendant whose actions could have possibly caused the contamination (Exxon was not arguing that any previous owners caused the leakages). Thus, *Triffler* dealt with a plaintiff who could not pinpoint exactly when the contamination occurred, but knew that it occurred as a result of Exxon's actions. Here, on the other hand, we are dealing with plaintiffs who know that the named defendants are previous owners/operators of a gasoline station located on their property, but do not know with certainty (or at least have not yet been able to definitively prove) that the contamination occurred during the tenancies of these particular defendants. Again, this is a very different situation from *Triffler*, where the chain of causation necessarily led to Exxon as the only operator of the leaking USTs. We agree with the *Triffler* court that where this chain of causation exists, the mere sale of the property does not break it. However, if the plaintiffs here cannot prove that the leakages at issue occurred during the tenancies of Chronister and Tri Star (as opposed to North States Oil), the chain of causation would not necessarily extend to defendants and we see no reason why they should be held responsible for the clean-up. *See Zands II*, 797 F.Supp. at 811. A finding to the contrary would stretch the liberal construction of the "contributing to" language in subsection (a)(1)(B) too far. We therefore conclude that in order to establish § 6972(a)(1)(B) liability under the general rule articulated in *Zands II*, plaintiffs must demonstrate that both Chronister and Tri Star were responsible for gasoline leaks that occurred during the periods when each of them operated the gasoline station on the property. If plaintiffs cannot meet this burden—and they have made no effort to do so in the briefs they have submitted thus far—then they cannot succeed in establishing the requisite causal relationship between the leakage and the defendants' activities that is necessary to establish "contributing to" liability.

■ However, plaintiffs may be able to establish defendants' liability under an alternative liability theory. *See e.g., Zands II,* 797 F.Supp. at 812–818; *Bayless Investment and Trading Co. v. Chevron U.S.A., Inc.,* No. 93–C–0704, 39 ERC 1428, 1994 U.S.Dist. LEXIS 12190, * (D.Ariz. May 26, 1994) (Plfs. Reply Ex. 5); *Dominick's Finer Foods, Inc. v. Amoco Oil Co.,* No. 93–C–4210, 1993 WL 524808, 1993 U.S.Dist. LEXIS 17668, *23 (N.D.Ill.Dec. 15, 1993) (Plfs.Stmt.Ex.6). In *Zands II,* the court found that in certain circumstances the burden of proof in an RCRA case can be shifted to the defendants under a theory of alternative liability to show that they are not responsible for contamination. 797 F.Supp. at 818. Presumptively, the rule for establishing contributor liability under the RCRA is that plaintiffs must show either "(1) that specific amounts of contamination occurred while each defendant owned or operated the property or (2) that the contamination occurred during defendants' collective ownership and operation of the property." *Zands II,* 797 F.Supp. at 811. It is only when plaintiffs "cannot prove which owner or operator 'caused' the contamination because more than one person owned the property and operated the gas station during the period of known contamination" (*i.e.,* are unable to make the showing required by (1)), will the court relieve plaintiffs of their burden to demonstrate which defendant caused specific amounts of contamination. *Id.* at 818. At this point "the Court will shift the burden to each of the owner/operator defendants to show the contamination did not occur during the period of the defendant's [collective] ownership or operation." *Id.* However, the burden shift will occur only if plaintiffs join as defendants "all persons who owned the property or operated the gas station for at least a portion of the time during which the contamination occurred ..." *Id.* at 817.

The use of this alternative liability framework implicates the issues of burdenshifting and joinder of all potential defendants which continue to sharply divide the parties in this case. Defendants contend that plaintiffs are attempting to invoke this burden-shifting rule and therefore must adhere to all of the requirements for its proper use, one of which is the joinder of all persons who owned or operated the contaminated property. For their part, plaintiffs never explicitly invoke the *Zands II* rule, instead maintaining throughout that their burden is to show that defendants "contributed to the past or present handling, storage, treatment, transportation, or disposal of [a] solid ... waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

However, it is plaintiffs' discussion of their burden of proof under the contribution prong of § 6972(a)(1)(B) that raises concern that they are in fact attempting to shift the burden on the causation issue to defendants. Specifically, as noted above, plaintiffs argue that in order to show causation they need not prove that a leakage occurred when each of the defendants was individually operating the gasoline station, only that the defendants operated the systems from which the leakage occurred (whether or not they were actually operating at the time of the leakage). By disclaiming their duty to show a causal connection between specific defendants and specific instances of petroleum leakages, defendants contend that plaintiffs are attempting to shift the burden of proof to the defendants to prove that they *did not* contribute to the contamination.

We agree with defendants that plaintiffs have attempted to operate under the lenient causation standard available under the alternative liability theory without fully complying with its procedural preconditions. We find that to the extent that plaintiffs in this case wish to invoke the benefits of the *Zands II* alternative liability rule (*i.e.*, lenient standard for proving causation), they must also comply with the rule's preconditions (*i.e.*, joinder of all responsible parties). Therefore, if they elect to omit North States Oil as a defendant, they must deal with the consequences of having to specifically show that identifiable leakages of petroleum occurred during Chronister and Tri Star's individual tenancies. In contrast, if plaintiffs want this court to employ the burden-shifting rule on the basis that the contamination at issue cannot be identified temporally or apportioned between the alleged wrongdoers, then they must join all defendants, including North States Oil, who may be responsible. *Id.; see also Bayless*, 1994 U.S. Dist. LEXIS, at *24.

■ Plaintiffs' main argument in response is that since North States Oil was not subject to RCRA regulations when it conducted operations on the property, it could not have violated these regulations and therefore need not be joined as a defendant.[5] However, we

---

**5.** Plaintiffs make other arguments in support of their contention that joinder of North States Oil, which operated a gasoline station on the property from 1959 to 1979 and installed the original steel USTs, is unnecessary. They contend that North States Oil need not be joined because (1) it is a defunct corporation; (2) it did not own any of the USTs as of the date they were last used or closed; and (3), the evidence does not indicate that a release occurred during or as the result of its tenancy. Plaintiffs further contend that joinder of North States Oil is not required under Fed.R.Civ.P. 19. However, these arguments do not address the issue of joinder in connection with the alternative liability rule and therefore are not relevant to our inquiry here.

Plaintiffs also state that the argument about joinder of North States Oil is "really an argument about who should bear the burden of locating former shareholders, determining whether they are still liable under corporate dissolution laws, ascertaining whether they have any assets,

and evaluating whether under Rule 11 they can be named as defendants. The Property Owners do not have to bear that burden because the RCRA expressly allows them to name only one defendant" (Plf. Reply at 7). It is true, as plaintiffs assert, that § 6972 permits a plaintiff to bring a citizen suit "against any person," and hence does not require joinder of all potential contributors under the strict terms of statute. However, the issue here is whether North States Oil must be joined as a defendant in order to justify shifting the burden of proving causation to the defendants. Plaintiffs are welcome to only name Chronister and Tri Star as defendants in this case. If they do so, they must meet the more stringent standards of causation under § 6972(a)(1)(B) required by the general theory of liability. If plaintiffs argue (which they have thus far) that they need not prove specific causation since the contamination cannot be strictly apportioned according to fault, then joinder of North States Oil is required.

do not see how the nonexistence of RCRA regulations matters with regard to plaintiffs' burden of proof under the contribution prong of § 6972(a)(1)(B). A more difficult question is posed by the fact that subsection (a)(1)(B) was not enacted until after the tenancy of North States Oil had expired. Subsection (a)(1)(B) was added to the citizen suit provision of the RCRA by amendment in 1984, five years after North States Oil assigned a sublease to Chronister and two years after North States Oil assigned the prime lease to Marathon. Although the Seventh Circuit has not squarely addressed this issue, we agree with the conclusion of other courts that have considered the issue that § 6972(a)(1)(B) applies retroactively to create liability for any person "who *has contributed* ... to the *past* or present" storage of solid waste. *See Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1159 (9th Cir.1989) (citing *Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) for the proposition that subsection (a)(1)(B) is an example of a statute applying retroactively); *Petropoulos v. Columbia Gas of Ohio, Inc.*, 840 F.Supp. 511, 515 (S.D.Ohio 1993) (finding that subsection (a)(1)(B) applies retroactively to lessee of garage space that owned, but discontinued using USTs before enactment of the statute). We think this conclusion is consistent with the analysis in *Zands II*, where the court required joinder of all contributing parties even though some of them operated a gasoline station on the property prior to the enactment of subsection (a)(1)(B). *Zands II*, 797 F.Supp. at 808.

Therefore, we find that plaintiffs must add North States Oil as a defendant in order to employ the alternative liability theory set forth in *Zands II*. If plaintiffs elect to take advantage of the burden-shifting rule, then they must first establish their *prima facie* case by showing that the contamination occurred during the period of defendants' collective operation of the gasoline station. *Id.* at 811. Plaintiffs have proffered evidence with respect to Chronister and Tri Star that

would permit them to meet their *prima facie* burden.[6]

With respect to Chronister, plaintiffs' evidence demonstrates that contamination was found around (1) the old steel USTs that Chronister used; (2) the old piping that Chronister disconnected and abandoned; (3) the second set of piping that Chronister installed and used; and (4) the relocated dispenser islands that Chronister installed and used. With respect to Tri Star, plaintiffs' evidence shows that contamination was found around (1) the old steel USTs that Tri Star used; (2) the piping that Chronister installed and Tri Star used; (3) the piping Tri Star installed to connect the new fiberglass USTs to the dispenser islands; and (4) the relocated dispenser islands that Chronister installed and Tri Star used.[7]

Under the alternative liability theory the burden would shift to defendants to show that the contamination did not occur during their respective periods of operation of the gasoline station. *Zands II*, 797 F.Supp. at 818. Defendants Chronister and Tri Star contend that they can make this showing. In support of this argument Tri Star resorts to a brief explanation of the history of gasoline prices and why the cheap gasoline available during North States Oil tenancy makes it reasonable to assume that the leakages were caused by North States Oil, not Chronister or Tri Star (who were faced with drastically higher prices which motivated them to avoid product loss). This argument, by itself, is conjecture, not fact. The economic incentive that Tri Star claims motivated it and Chronister to avoid spillage does nothing to elucidate whether there were actual petroleum leakages resulting from defendants' activities during their operation of the gasoline station. Insofar as Tri Star attempts to defeat plaintiffs' subsection (a)(1)(B) claim with this historical argument, it fails.

However, defendants also make more concrete assertions as to why the evidence produced by plaintiffs does not establish their liability as contributors. First, both Chronis-

---

**6.** This evidence also implicates North States Oil, although plaintiffs do not argue this point since North States Oil has not been named as a defendant.

**7.** It appears from plaintiffs' position papers that their evidence of contamination comes from a study of the property conducted by plaintiffs' consultant, RAM Engineering (Plfs. Stmt Ex. 3).

ter and Tri Star claim that they never used the old lines (installed by North States Oil and disconnected by Chronister) running from the steel USTs to the service islands. Next, they dispute that the contamination found around the lines Chronister installed was caused by leakages from those lines since they contend that the petroleum could not have leaked through the gravel surrounding the lines. They also contend that while Chronister was in possession of the site it tested the lines and USTs and found no leaks. Tri Star asserts that no contamination was found around the area containing Tri Star's new fiberglass USTs, a claim which plaintiffs do not seem to dispute. Chronister contends that since it never used the relocated pump islands and the fiberglass USTs and piping installed by Tri Star, it cannot be responsible for any contamination associated with those areas. Tri Star does not dispute that contamination was found near the pump island areas that it used, and neither Tri Star nor Chronister dispute that contamination was found near the old USTs which both used. However, they argue that the contamination found around these areas could not be a result of their activities since they implemented testing procedures which never detected any leakages during their tenancies.

■ We think that the evidence presented thus far would create a genuine issue of material fact as to whether defendants are liable for contributing to contamination under an alternative liability theory. Plaintiffs would meet their initial burden by proffering evidence indicating that defendants used the systems associated with contamination, even though they are unable to show exactly when the petroleum leaks occurred. In turn, defendants Chronister and Tri Star claim that they did not use some of the contaminated systems (*e.g.,* the old piping) and assert that they are able to proffer some evidence that the systems they did use (old USTs, new piping) always tested "tight" during their tenancies. These differing accounts present a factual dispute that could not be resolved on summary judgment. We reiterate that our finding here applies only to the extent that plaintiffs add North States Oil as a defendant and thereby invoke the burden-shifting approach.

The defendants also make a separate argument in response to plaintiffs' § 6972(a)(1)(B) claims. Specifically, they assert that plaintiffs cannot attempt to hold defendants strictly liable for the entire site remediation under the RCRA since plaintiffs are "owners" whose passive behavior has contributed to the contamination. Defendants cite *Zands II,* where the court stated that "individuals who own and operate gas stations benefit financially from their gas stations, [and therefore] should be held responsible and accountable for injury to the environment...." 797 F.Supp. at 810. For the following reasons we find that defendants' attempt to avert their own potential liability by attempting to impute liability to plaintiffs as property owners must fail.

We note that this is a close issue that no previous court has squarely addressed. As discussed above, the language of the statute sets forth a broad notion of liability, as it permits lawsuits "against any person ... including any past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to" solid waste disposal. 42 U.S.C. § 6872(a)(1)(B). It is clear that this definition imposes liability on owners of contaminated property in certain circumstances. *See Bayless,* 1994 U.S. Dist. Lexis 12190; *Zands II,* 797 F.Supp. at 810; *Price,* 523 F.Supp. at 1073 (finding that defendants who knowingly purchased property that had been used as a landfill and who did nothing to abate the hazardous conditions that existed on the property after they were discovered could be held liable). However, even under the broadest reading of contribution, courts have established that there are some limitations on when property owners can be held liable under the statute. *See Triffler,* 1994 WL 643237, *6, 1994 U.S. Dist. LEXIS 16158, *17–20 (Pl.Ex.7) (finding that § 6972's long reach did not extend to "passive prior owners of property whose only 'contribution' to the disposal was an innocent failure to discover its occurrence during their period of ownership"); *First San Diego Props. v. Exxon Co.,* 859 F.Supp. 1313 (S.D.Cal.1994); *Zands I,* 779 F.Supp. at 1264 (stating that an individual who sold land to individuals who then in-

stalled USTs could not be held liable). Thus, the issue of whether absentee property owners, like plaintiffs here, who knowingly lease their property for a commercial use that generates solid waste, is an open one.

■ We find that defendants here may not avoid liability by attempting to cast plaintiffs as the responsible party. The cases where property owners are found liable under the RCRA involve situations where the property owners also owned the gasoline station located on the properties. Thus, in *Zands II,* the defendant property owners also owned the piping, pumps, and service station on the property. 797 F.Supp. at 808. Similarly, in *Bayless,* the court found that the plaintiff had also contributed to the contamination where plaintiff "owned all of the improvements on the Property including USTs" and "received amounts of rent directly tied to the amount of gasoline brought onto and sold from the Property." 1994 U.S. Dist. LEXIS 12190, at *27.

Here, plaintiffs stand in a different situation. In 1979, plaintiffs entered into the prime lease with North States Oil. Under the prime lease, which governed during the tenancies of Chronister and Tri Star, the property was leased "for any lawful purposes" (Cplt.Ex.1, ¶ 3), and the lessee was entitled to make any construction or improvements as it deemed beneficial (Cplt.Ex.1, ¶ 6). Plaintiffs received rental payments from the lessees, but these were in no way tied to the particular use of the property (Cplt.Ex.1, ¶ 2). At the termination of the lease "all buildings, improvements, changes, and additions" were to become the property of the lessor, excepting "trade fixtures," which were to be removed such that the property was restored to its condition prior to the affixing of such trade fixtures (Cplt.Ex.1, ¶ 6). Plaintiffs claim, and defendants do not dispute, that the USTs were trade fixtures. Under the terms of the prime lease, then, plaintiffs did not actually own the major components of the gasoline station, they simply leased the land upon which the gasoline station owners operated their business. Thus, although (as defendants point out) plaintiffs here are unlike those in *Triffler* and *First San Diego,* where the plaintiff/owners had purchased the contaminated property after it had been pre-

viously used as a gasoline station, we think that they are nevertheless outside the admittedly broad reach of § 6972 liability. They neither owned the equipment necessary to operate the gasoline station nor derived a profit that was explicitly tied to the property being used as a gasoline station. Although it may reasonably be said that plaintiffs' passive behavior "helped to cause" the leakages in question, this is not enough to establish liability under the "contributing to" language of § 6972(a)(1)(B). *Zands I,* 779 F.Supp. at 1264. Therefore, if plaintiffs can show that defendants were in fact responsible for contributing to the contamination which now exists on the property, defendants cannot escape liability simply because plaintiffs had entered into an arms-length contractual arrangement whereby defendants were given permission to operate a gasoline station.

In closing, we note that even if this court were to assume that plaintiffs were able to establish that some or all of the defendants were liable for the contamination, the issue of the appropriate allocation of the burden of remediation would not disappear. Under the RCRA, this court has broad authority to fashion equitable remedies in that we may order persons held liable under subsection (a)(1)(B) "to take such other action[s] as may be necessary ..." 42 U.S.C. § 6972(a). It is clear that a court may order a defendant to "participate in monitoring, investigating, reporting and restoring a contaminated parcel of land" as part of its equitable powers under the RCRA. *Bayless,* 1994 U.S.Dist. LEXIS, at *10. While joint and several liability may be appropriate if the harm is indivisible, *Conservation Chemical,* 619 F.Supp. at 199, where the harm can be separated, liability must be allocated accordingly. For example, Chronister claims that it can identify certain areas of contamination for which it is not responsible. If that is true (and we make no finding that it is), then joint and several liability would not be appropriate and liability would have to be apportioned according to fault. Of course, this means that if Tri Star and Chronister were able to show that none of the contamination on the property were attributable to their conduct, then plaintiffs would be left with an action against North States Oil and the burden would fall on plain-

tiffs to attempt to recover against that defendant.

### CONCLUSION

For the foregoing reasons, we make the following conclusions. First, with respect to § 6972(a)(1)(A), we find that issues of fact exist which preclude a finding of Tri Star's liability. Although it is true that Tri Star has failed to comply with applicable UST laws and regulations, it is not clear whether this failure is the result of actions by plaintiffs that would make the imposition of § 6972(a)(1)(A) liability inappropriate. Second, with respect to § 6972(a)(1)(B), we find that plaintiffs may proceed under either a general or alternative liability theory. Under the general liability theory, plaintiffs would have to demonstrate that both Chronister and Tri Star were responsible for gasoline leaks that occurred during the periods when each of them operated the gasoline station on the property. Thus far, plaintiffs have not attempted to make this showing. Under the alternative liability theory, plaintiffs would first have to join North States Oil as a defendant. Once they did this, they would have to establish that the contamination occurred during the period of the defendants collective operation of the gasoline station. Each defendant would then have the burden of showing that the contamination did not occur during its period of operation. Based on the evidence presented thus far, we think that issues of fact exist with regard to whether defendants Chronister or Tri Star would be able to meet this burden.