**RAYMOND K. HOXSIE REAL ESTATE TRUST, Raymond K. Hoxsie, Trustee, and Katherine W. Hoxsie, Trustee, Plaintiffs,**

v.

**EXXON EDUCATION FOUNDATION, Exxon Corporation, Sunoco, Inc., James J. Chinigo, Donald Ardinger, and Edward F. Phalen, Defendants.**

No. 97–557–L.

United States District Court, D. Rhode Island.

Feb. 4, 2000.

William M. Dolan, III, Brown, Rudnick, Freed & Gesmer, Providence, RI, for plaintiff.

Ralph T. Lepore, III, Deborah E. Barnard, Elizabeth M. Mitchell, Holland & Knight LLP, Boston, MA, for Exxon, defendant.

Robert D. Fine, Annie Talbot, Chace, Ruttenberg & Freedman, Providence, RI, for Exxon, defendant.

William J. Stack, Exxon Company USA, Houston, TX, for Exxon, defendant.

John B. Reilly, Warwick, RI, for Sun Company, defendant.

Edward H. Newman, Westerly, RI, for defendant Ardinger.

Nancy E. Wildes, Pawcatuck, CT, for defendant Phelan.

### DECISION AND ORDER

LAGUEUX, District Judge.

This case arises from petroleum hydrocarbon contamination at two properties owned by plaintiff Raymond K. Hoxsie Real Estate Trust ("Trust"), of which plaintiffs Raymond and Katherine Hoxsie are trustees (collectively "plaintiffs"). Plaintiffs brought this action in September, 1997 against the above named defendants, seeking judgment on four counts. Only the first three are currently at issue. Counts I and II seek an injunction under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., requiring all defendants, with the excep-

tion of Sunoco, Inc. ("Sun"), to remediate the contamination. Count III seeks damages from the same defendants under R.I.Gen.Laws § 46–12–21 for their alleged pollution of groundwater at plaintiffs' properties. Defendants Exxon Educational Foundation and Exxon Corporation ("the Exxon defendants") seek summary judgment on Counts I, II and III, essentially alleging that the statutory remedies invoked by plaintiffs are not available to them as a matter of law.

For the reasons set forth below, this Court denies the Exxon defendants' motion for summary judgment as to Counts I and II, but grants the motion as to Count III.

I.  Background

Plaintiff Trust presently owns several pieces of property in a commercial area in Westerly, Rhode Island on which a car dealership is operated. These properties include 92 and 98 Granite Street, which are at issue in this case. The property at 92 Granite Street was operated as a gasoline service station from at least 1950 until 1984.[1] The Exxon defendants' predecessor in interest acquired the 92 Granite Street property from Lehigh Realty Co., Inc. in 1958. Various independent franchise dealers, including Thomas Holliday, defendant James J. Chinigo, Frederick E. Doty, Jr., defendant Edward F. Phelan and defendant Donald Ardinger, used this property to sell Exxon gasoline and related products from approximately 1960 until sometime prior to October 11, 1984. Between September 1984 and October 11, 1984, the Exxon defendants caused to be removed from 92 Granite Street several underground storage tanks ("USTs") that had been used to store petroleum, and terminated use of the property as a service station. They maintain that all of the USTs used by them were removed at that time.

In August, 1985, the Exxon defendants sold 92 Granite Street to Joseph A. Clancy and Merton L. Matthews. In 1986, plaintiff Raymond Hoxsie acquired both 92 and 98 Granite Street from Clancy and Matthews. Plaintiff Trust acquired both properties from plaintiff Raymond Hoxsie in 1993.

In October, 1994, defendant Sun contacted plaintiff Raymond Hoxsie and asserted that contamination from 92 Granite Street was impacting and interfering with remediation being undertaken by Sun at 87 Granite Street, which is down gradient in a southwesterly direction from 92 Granite Street. As a result, plaintiffs undertook an environmental investigation of 92 Granite Street in early 1995. Plaintiffs discovered two USTs, as well as soil and groundwater contamination in the form of petroleum hydrocarbons and volatile organic compounds. Plaintiffs removed the USTs and remediated the contamination to the satisfaction of the Rhode Island Department of Environmental Management ("RIDEM") by January, 1997. No evidence has been presented as to the ownership of the two discovered USTs.

In February, 1997, Sun reasserted its claim that contamination from 92 Granite Street was interfering with remediation at 87 Granite Street. As a result, plaintiffs undertook further environmental investigation at both properties. According to a report prepared by Applied Enviro–Tech, Inc. and dated June 14, 1997, the investigation revealed two primary areas of gasoline contamination: an area at 92 Granite Street known as the "PB–2" area, part of which appeared to be a former UST grave, and an area at 98 Granite Street known as the "PB–3" area, which is down gradient in a southwesterly direction from the PB–2 area. The contamination consists of volatile organic compounds existing in the soil and groundwater of both areas in excess of applicable RIDEM standards, in addition to visible but not measurable free-phase

---

1. The Exxon defendants claim that the property was used as a gas station beginning in 1920, but offer no evidence to establish that fact.

product at the PB–3 area, also a violation of RIDEM standards. As part of the investigation, a portion of the PB–2 area was excavated (the "PB–2 Test Pit"), revealing broken concrete pads saturated with product, galvanized pipe, contaminated soil and non-native soils. The excavated portion was returned to the ground after testing.

In January, 1998, as a result of this report, RIDEM required plaintiffs to submit a Corrective Action Plan ("CAP") for remediating the contamination. Plaintiffs submitted a CAP in February, 1999, which proposed the removal of contaminated soils from the PB–2 area, installation of monitoring wells and quarterly groundwater monitoring. The CAP was approved by RIDEM in March, 1999, subject to the additional requirement that the CAP be revised to address the remediation of contamination in the PB–3 area.

Plaintiffs brought suit in September, 1997, alleging that the contamination on both properties was caused by the petroleum USTs used at 92 Granite Street during the Exxon defendants' ownership. Counts I and II of plaintiffs' complaint seek an injunction pursuant to the citizen suit provision of RCRA, §§ 6972(a)(1)(A) and (a)(1)(B), requiring the Exxon defendants and the defendants who operated a franchised service station at 92 Granite Street to complete the necessary remediation at 92 and 98 Granite Street. Count III seeks damages from those defendants under R.I.Gen.Laws § 42–12–21 for past and future costs associated with the groundwater contamination and its remediation. Count IV, not at issue in this motion, seeks a declaratory judgment that the contamination at plaintiffs' properties is not interfering with remediation efforts being undertaken by Sun at 87 Granite Street.[2]

The Exxon defendants have brought this motion for summary judgment on Counts I, II and III. Specifically, the Exxon defendants contend that plaintiffs cannot prevail under § 6972(a)(1)(A), which requires a current violation of RCRA or corresponding regulations, because they ceased use of and removed their UST system at 92 Granite Street prior to the effective date of the regulations that are allegedly being violated. In addition, the Exxon defendants argue that plaintiffs cannot prevail under § 6972(a)(1)(B) because plaintiffs cannot, as a matter of law, establish two of three required elements, namely, that the contamination presents an imminent and substantial endangerment to health or the environment and that the Exxon defendants contributed to the contamination. Finally, the Exxon defendants contend that plaintiffs cannot prevail under R.I.Gen.Laws § 42–12–21 because plaintiffs have produced no evidence that the Exxon defendants violated the statute by polluting the groundwater at plaintiffs' property after 1980, the year in which the statute was enacted.

## II. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Thus, summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether summary judgment is appropri-

---

**2.** Sun asserted a counterclaim against plaintiffs under RCRA and applicable state law alleging that the contamination at plaintiffs' property is interfering with its remediation efforts at 87 Granite Street. In response, plaintiffs asserted contribution and indemnity claims against the Exxon defendants. Plaintiffs, the Exxon defendants and Sun have settled this claim out of court.

ate, the Court must view the facts on the record and all inferences therefrom in the light most favorable to the nonmoving party. *See Continental Cas. Co. v. Canadian Universal Ins. Co.,* 924 F.2d 370, 373 (1st Cir.1991).

A grant of summary judgment "is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.,* 777 F.Supp. 167, 169 (D.R.I. 1991). At the summary judgment stage, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood[.]" *Greenburg v. Puerto Rico Maritime Shipping Auth.,* 835 F.2d 932, 936 (1st Cir.1987). Summary judgement is only available when there is no dispute as to any material fact and only questions of law remain. *See Blackie v. Maine,* 75 F.3d 716, 721 (1st Cir.1996).

III.   RCRA Claims

Congress enacted RCRA, 42 U.S.C. §§ 6901 et seq., in 1976 to eliminate "the last remaining loophole in environmental law, that of unregulated land disposal of discarded materials and hazardous wastes." H.R.Rep. No. 94–1491, at 4 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6238, 6241. On November 8, 1984, Congress enacted The Hazardous and Solid Waste Amendments of 1984 ("HSWA"), which, among other things, added Subtitle I to RCRA. *See* Pub.L. No. 98–616, § 601(a), 98 Stat. 3221, 3277 (*codified as amended at* 42 U.S.C. §§ 6991–6991i (1994 & Supp.1996)). Subtitle I required the Environmental Protection Agency ("EPA") to develop regulations establishing a program for UST release prevention and remediation. *See id.* The EPA's regulations detailing release response and corrective action requirements for petroleum-containing USTs were promulgated on September 23, 1988 and took effect on December 22, 1988. *See* 53 Fed.Reg. 37,-082 (1988) (*codified at* 40 C.F.R. subpt. F, §§ 280.60–280.67 (1999)). These regulations "apply to all owners and operators of an UST system as defined in § 280.12[.]" 40 C.F.R. § 280.10(a) (1999). Section 280.12 defines "owner," in relevant part, as follows: "In the case of any UST system in use before November 8, 1984, but no longer in use on that date, any person who owned such UST immediately before the discontinuation of its use." 40 C.F.R. § 280.12 (1999).

RCRA, as amended, provides for individual citizen suits against violators, in relevant part, as follows:

Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—

(1)(A) against any person ... who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter; or

(B) against any person ... including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment[.]

42 U.S.C. § 6972(a) (1994).

A.   Count I

Plaintiffs bring their first count pursuant to 42 U.S.C. § 6972(a)(1)(A). Both sides correctly state the requirement that, in order to bring suit under this provision, a plaintiff must allege a current violation of RCRA. *See Gwaltney of Smithfield Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 59, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). The Exxon defendants argue that plaintiffs have failed to meet this requirement because their USTs were removed

from the property no later than October 11, 1984, a month before HSWA was enacted and four years before the corresponding regulations took effect.

Plaintiffs, however, argue that the Exxon defendants are an "owner" of the UST system within the meaning of 40 C.F.R. § 280.12. Therefore, since an owner "must, in response to a confirmed release from the UST system, comply with the requirements of [Subpart F,]" 40 C.F.R. § 280.60 (1999), the Exxon defendants can currently be in violation of RCRA by failing to remediate, as dictated by the regulations, contamination caused by the system.

Plaintiffs' argument was squarely adopted in *Dydio v. Hesston Corp.*, 887 F.Supp. 1037, 1045 (N.D.Ill.1995). In that case, plaintiff brought suit under § 6972(a)(1)(A) in an effort to compel a prior owner of plaintiff's property to remediate petroleum contamination which had allegedly been caused by leaking USTs. *See id.* at 1039. The facts were undisputed that defendant's predecessor in interest had installed, operated and maintained a petroleum UST system on the property until approximately July 10, 1975 when defendant vacated the property. *See id.* The UST system was not used subsequent to that date. *See id.* In 1994, petroleum contamination was discovered. *See id.* Defendant made a motion to dismiss, arguing, as the Exxon defendants do here, that it could not currently be in violation of RCRA because it had ceased use of the USTs in 1975. *See id.* at 1041. The Court rejected defendant's argument and concluded that, as an "owner" within the meaning of 40 C.F.R. § 280.12, defendant could be liable for a current violation of RCRA by failing to remediate confirmed contamination resulting from UST leaks. *See id.* at 1043–1045. Thus, the Court concluded that the regulations "create a regime under which past owners of USTs have continuing obligations to take corrective action following the confirmed release of a regulated substance[.]" *Id.* at 1045.

■ The Exxon defendants do not argue with the reasoning in *Dydio*, but instead attempt to escape its application because the USTs at issue in this case were removed from the ground prior to the enactment of HSWA, unlike the USTs in *Dydio*, which were still in the ground at the time the contamination was discovered in 1994. This Court disagrees that such a distinction affects the Exxon defendants' potential liability.

First, the plain language of the regulation makes clear that the Exxon defendants' status as "owner" is not altered by such a distinction. Section 280.12 clearly bases ownership on when a UST system ceased to be "in use"—there is no suggestion that systems that ceased to be "in use" and were subsequently removed from the ground are excepted from the definition. Since the Exxon defendants have not argued that the definition does not apply to them for any other reason, this Court must presume that they are an "owner" for the purposes of this motion.

Second, a principled reason for the distinction would exist only if the "confirmed release" from the system triggering an owner's corrective action duties, 40 C.F.R. § 280.60 (1999), must have occurred after the enactment of HSWA in order to create a current RCRA violation. The Exxon defendants apparently argue that there is such a requirement and, as their tanks were removed prior to the enactment date, no release could have occurred to create a current violation. This Court rejects that contention.

There is absolutely no language in the statute or regulations, nor any legislative history, suggesting that a "confirmed release" must have occurred after the statute's enactment to trigger an owner's corrective action duties. *See* Michael J. Maher and Sheila Horan, Lessons in L.U.S.T.: The Complete Story of Liability for Leaking Underground Storage Tanks, 16 N.Ill.U.L.Rev. 581, 585 (1996) (HSWA "makes no distinction between current releases versus past releases, leading to the

conclusion that clean-up obligations apply equally to current spills and past spills.").

Furthermore, the *Dydio* Court addressed this issue, albeit by dictum, and clearly concluded that its analysis did not depend on the timing of the alleged leak. *See id.* at 1041–1042. In a footnote, the Court noted that "it is unclear from the complaint when the leaking alleged in this suit began. The complaint merely indicates that the tanks were determined to be leaking in 1994. It is entirely possible ... that the tanks began leaking while [defendant] was still in actual possession of the property and the tanks." *Id.* at 1042 n. 5 (citation omitted). The Court also stated, regarding the timing of the leaks, that "this is all beside the point, because the essence of [plaintiff's] claim is not that [defendant] violated RCRA by causing a release; rather, it is that [defendant] is presently violating RCRA by failing to take corrective action as is required by the regulations." *Id.* at 1041. By adopting the plaintiff's position in that case, it is clear that the *Dydio* Court concluded that an owner's failure to remediate a confirmed leak, regardless of when the leak took place, is a "current" violation of RCRA.

Thus, since the Exxon defendants offer no other basis for a grant of summary judgment, their motion on this Count is denied. Plaintiffs, of course, will have to prove at trial that the Exxon defendants are actually violating RCRA or its regulations.

**B. Count II**

Plaintiffs bring their second count pursuant to 42 U.S.C. § 6972(a)(1)(B). In order to prevail under this section, a plaintiff must show:

> (1) the alleged endangerment stems from [the handling, storage, treatment, transportation, or disposal of] a solid or hazardous waste as defined by RCRA, (2) conditions which may present an imminent and substantial endangerment, and (3) the defendant has contributed to

or is contributing to such handling, storage, treatment, transportation, or disposal.

*Craig Lyle Ltd. Partnership v. Land O'Lakes, Inc.*, 877 F.Supp. 476, 480 (D.Minn.1995). *See also* 42 U.S.C. § 6972(a)(1)(B) (1994). The Exxon defendants do not claim that the gasoline contamination at plaintiffs' properties does not constitute solid waste within the meaning of RCRA. *See Waldschmidt v. Amoco Oil Co.*, 924 F.Supp. 88, 90–91 (C.D.Ill.1996) (petroleum contamination constitutes a solid waste under RCRA). They do, however, contend that plaintiffs cannot prove the last two requirements of "imminent and substantial endangerment" and contribution. A finding that plaintiffs are unable, as a matter of law, to prove one or both of these elements would mandate the award of summary judgment to the Exxon defendants on this Count. However, because this Court concludes that there are genuine issues of material fact as to both elements, the Exxon defendants' motion for summary judgment on Count II is denied.

*Imminent and Substantial Endangerment*

The words "imminent and substantial endangerment" are not defined in the statute; however, several courts have explicated the intended meaning. First, the use of the qualifying word "may" preceding the "imminent and substantial" standard is not mere surplusage: "[t]his is 'expansive language,' which is 'intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes.'" *Dague v. City of Burlington*, 935 F.2d 1343, 1355 (2nd Cir.1991) (quoting *United States v. Price*, 688 F.2d 204, 213–214 (3rd Cir.1982)) (emphasis added in *Dague*), *rev'd in part on other grounds*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Second, imminence "'implies that there must be a threat which is present *now*, although the impact of the threat may not be felt until later.'" *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 486, 116

S.Ct. 1251, 134 L.Ed.2d 121 (1996) (quoting *Price v. United States Navy*, 39 F.3d 1011, 1019 (9th Cir.1994)) (emphasis added in *Price*). Third, an endangerment is substantial "if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm ... if remedial action is not taken." *Lincoln Properties, Ltd. v. Higgins*, 1993 WL 217429, *13 (E.D.Cal.1993) (citing *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 194 (W.D.Mo.1985)). Finally, "endangerment" means a threatened or potential harm and does not require proof of actual harm. *Dague*, 935 F.2d at 1356.

■ It is undisputed that the contamination levels on plaintiffs' property exceed state standards developed by RIDEM and that RIDEM required plaintiffs to submit a CAP. The Exxon defendants, however, argue that the RIDEM standards cannot be used to determine whether the contamination presents an imminent and substantial endangerment because they dispute plaintiffs' claim that the standards are "risk-based." Conformance with state environmental standards is relevant in determining whether contamination constitutes an imminent and substantial endangerment, *see Lefebvre v. Central Me. Power Co.*, 7 F.Supp.2d 64, 68–69 (D.Me.1998) (finding evidence of imminent and substantial endangerment sufficient to preclude summary judgment where a field data summary from the state Department of Environmental Protection indicated hazards warranting additional investigation); *Wilson v. Amoco Corp.*, 989 F.Supp. 1159, 1175–1177 (D.Wyo.1998) (granting preliminary injunction in part because of likelihood of success on § 6972(a)(1)(B) claim because the existence of contamination "in excess of health-based residential land use standards" and contrary to state policy for protection of groundwater indicated an imminent and substantial endangerment); *Lincoln Properties*, 1993 WL 217429 at *13 (denying summary judgment because contamination may present an imminent and substantial endangerment partly be-

cause it exists in concentrations "far exceeding federal and state standards"), and compliance with such standards may be enough to preclude a finding of imminent and substantial endangerment as a matter of law. *See Price*, 39 F.3d at 1019–1021 (affirming dismissal of § 6972(a)(1)(B) claim because the contamination could not pose an imminent and substantial endangerment in part because state regulatory authority remediated site and determined that no further threat existed); *Avondale Federal Sav. Bank v. Amoco Oil Co.*, 170 F.3d 692, 693–695 (7th Cir.1999) (affirming grant of summary judgment to defendant on imminent and substantial endangerment issue where state Environmental Protection Agency had issued a letter releasing site from further remediation), *cert. denied sub nom., Manufacturers Bank v. Amoco Oil Co.*, —— U.S. ——, 120 S.Ct. 284, 145 L.Ed.2d 238 (1999).

■ No court, however, has held that such evidence is insufficient as a matter of law to establish an imminent and substantial endangerment. This Court will not be the first to so hold. The Exxon defendants' argument simply highlights the factual nature of the imminent and substantial endangerment inquiry. The emphasis placed upon the standards will be for a factfinder to determine. For now, it is sufficient for plaintiff to come forward with undisputed (or genuinely disputed) evidence that could reasonably lead a factfinder to determine that an imminent and substantial endangerment exists. Viewing the facts and all reasonable inferences therefrom in the light most favorable to plaintiffs, as this Court is required to do, the existence of contamination on plaintiffs' properties in excess of state environmental standards constitutes such evidence.

■ Furthermore, plaintiffs point to deposition testimony of their expert, who opines that the contamination at the PB–2 location migrated in a south and southwest direction to cause the contamination at the PB–3 location. The existence of free-

phase product at the PB–3 location supports this opinion. A history of migration and the potential for future migration of the contamination is also a relevant consideration in an imminent and substantial endangerment inquiry. *See Murray v. Bath Iron Works Corp.*, 867 F.Supp. 33, 42 (D.Me.1994) (denying summary judgment based on "the continued presence of contaminants in the soil and the past migration of these substances into the groundwater"); *Lincoln Properties*, 1993 WL 217429 at *13–14 (denying summary judgment because contamination may present an imminent and substantial endangerment partly because it undisputedly "migrated vertically and laterally in the subsurface, and may continue to so migrate"). *But see Price*, 39 F.3d at 1020–1021 (affirming dismissal of § 6972(a)(1)(B) claim because the contamination could not pose an imminent and substantial endangerment in part because the contamination in question was contained by a concrete slab foundation).

The Exxon defendants raise several additional arguments as to why plaintiffs, despite the above evidence, cannot establish an imminent and substantial endangerment. Each can be quickly dispatched.

First, the Exxon defendants argue that since plaintiffs have not produced an expert opinion that the contamination presents an imminent and substantial endangerment, plaintiffs cannot prove the point. This Court rejects that contention. Neither of plaintiffs' experts stated that the contamination *didn't* present an imminent and substantial endangerment, they simply stated that they were not asked to form an opinion on that question. The absence of an expert opinion on the ultimate factual issue is not fatal to plaintiffs' case. As noted, the evidence discussed above is sufficient to allow a factfinder to conclude that an imminent and substantial endangerment exists.

■ Second, the Exxon defendants argue that plaintiffs have not identified a population or resource threatened by the contamination, therefore an imminent and substantial endangerment cannot exist. Similarly, the Exxon defendants argue that the designation of the groundwater in the vicinity of 92 and 98 Granite Street as non-potable compels the same conclusion. However, plaintiffs have clearly identified at least two threatened resources—the groundwater and the soil in the vicinity of the properties which is contaminated at levels exceeding state standards. The water's designation as non-potable is not fatal. The statute clearly speaks of endangerment to the "environment." Groundwater, potable or not, and soil are a part of the environment. *See Lincoln Properties*, 1993 WL 217429 at *13 (concluding that the term "environment" includes air, soil and water). It is not necessary for plaintiffs to quantify the endangerment. *See id.* Furthermore, plaintiffs have produced deposition testimony indicating that there is a residential neighborhood down gradient from the Sun property at 87 Granite Street, which is down gradient from plaintiffs' properties, suggesting a particular human population potentially at risk of exposure to the contaminants. Consequently, these arguments do not entitle the Exxon defendants to summary judgment on Count II.

Finally, the Exxon defendants argue that plaintiffs' own actions of returning the excavated materials to the PB–2 Test Pit and failing to remediate the properties proves that there is no imminent and substantial endangerment. That contention is untenable. The RCRA citizen suit provision provides only for injunctive relief, not for the recovery of remediation costs once the cleanup is complete. *See Meghrig*, 516 U.S. at 488, 116 S.Ct. 1251. Plaintiffs cannot be penalized for complying with the statutory regime under which relief may be available. Furthermore, the fact that the contamination may not present an emergency situation requiring immediate implementation of the CAP is not dispositive of the question of whether plaintiffs

have produced sufficient evidence to establish a genuine issue of material fact as to whether the contamination may present an imminent and substantial endangerment. *See id.* at 486, 116 S.Ct. 1251 (a threat can be imminent even though its impact " 'may not be felt until later' ") (citation omitted).

For the preceding reasons, this Court concludes that plaintiffs' evidence of contamination in excess of state standards and evidence of migration of that contamination is sufficient to establish a genuine issue of material fact as to whether the contamination presents an imminent and substantial endangerment to health or the environment.

### Contribution

Plaintiffs must also establish that "the contamination at issue is the 'direct result' of defendant['s] . . . activities and that specific amounts of leakage occurred during the [period] when ... [defendant] was operating the gasoline station." *Aurora Nat'l Bank v. Tri Star Mktg., Inc.*, 990 F.Supp. 1020, 1029 (N.D.Ill.1998) (quoting *Zands v. Nelson*, 797 F.Supp. 805, 810 (S.D.Cal.1992)).

Plaintiffs have produced the following evidence that a leak occurred during the Exxon defendants' ownership (1958–1984): 1) documentation and deposition testimony establishing that the Exxon defendants removed leaking tanks from 92 Granite Street in 1970 and 1977, 2) deposition testimony of plaintiffs' expert establishing the absence of methyl tertiary butyl ether (MTBE), an additive that was used in unleaded gasoline beginning sometime in the early 1980's, in the contamination at PB–2 and PB–3, 3) deposition testimony of plaintiffs' expert opining that contaminants resulting from releases prior to 1958 would not have persisted until the present time in the soil or groundwater and 4) deposition testimony of plaintiffs' expert expressing the opinion that the leak occurred between 1958 and 1980.

The Exxon defendants offer no counter evidence, but instead argue that plaintiffs' evidence does not create a genuine issue of material fact because the timing of a leak has not been identified to a scientific certainty. Therefore, the Exxon defendants argue that the contamination could have resulted from a UST system used by the prior operator of a gas station on the property, Lehigh Petroleum.[3]

■ This argument, however, places too much of a production burden on plaintiffs. Circumstantial evidence is sufficient to allow a factfinder to determine the timing of a leak, in situations of consecutive ownership, when it cannot be determined by direct evidence. *See Zands,* 797 F.Supp. at 811. This Court therefore concludes that a genuine issue of material fact exists as to whether a UST leak occurred during the Exxon defendants' ownership of 92 Granite Street.

Plaintiffs have similarly produced enough evidence to establish a genuine issue of material fact as to whether a leaking petroleum tank caused the contamination at PB–2, which in turn caused the contamination at PB–3. Plaintiffs point to deposition testimony of their expert, expressing the opinion that the PB–2 area, of which an apparent UST grave was a part, was contaminated as a result of leaking petroleum USTs. In addition, the evidence, discussed above, of the contamination's migration to the PB–3 location, specifically the existence of free-phase product at that location, strongly supports causation. Again the Exxon defendants have not countered this evidence with any of its own but have merely questioned its sufficiency.

■ In a final attempt to establish a basis on which to secure a summary judgment, the Exxon defendants argue that plaintiffs' excavation of the PB–2 Test Pit and the return of the excavated materials

---

**3.** The Court notes, however, that there is no evidence of the existence of such a UST sys-    tem in the current record.

to the ground cuts off the chain of causation so that the Exxon defendants could not be found to have contributed to the contamination. This Court does not agree. Plaintiffs' activities could not have caused the contamination at the PB–2 location since, if it had not already been present, the excavation would not have revealed contamination. In addition, the Exxon defendants present no evidence that the contamination at the PB–3 location is the result of the return of the excavated materials to the PB–2 Test Pit. Plaintiffs evidence suggests otherwise; that the contamination at the PB–3 location was the result of the existing PB–2 contamination. Again, the Exxon defendants cannot use plaintiffs' activities, undertaken to obtain relief under RCRA's statutory regime, to defeat plaintiffs' claims as a matter of law.

For the above reasons, this Court concludes that there exists a genuine issue of material fact as to whether the Exxon defendants "contributed to" the contamination on plaintiffs' properties.[4]

Since genuine issues of material fact exist with regard to both the imminent and substantial element and the contribution element of 6972(a)(1)(B), the Exxon defendants' motion for summary judgment on Count II is denied.

## IV. Rhode Island State Law Claim

Plaintiffs' third count seeks recovery pursuant to R.I.Gen.Laws § 46–12–21, which provides that "[a]ny person who shall negligently or intentionally pollute groundwater shall be liable to any other person who is damaged by the pollution." R.I.Gen.Laws § 46–12–21 (1996). This provision was enacted in 1980. *See* 1980 R.I.Pub.Laws, ch. 239, § 3.[5]

■ The Exxon defendants seek summary judgment on Count III because they claim that plaintiffs are improperly attempting to apply the statute retroactively, since plaintiffs have only produced evidence of alleged UST leaks, which could have polluted the groundwater, occurring before 1980 (specifically in 1970 and 1977). Plaintiffs do not disagree that the statue

4. Because this Court concludes that plaintiffs have established a genuine issue of material fact as to whether a contamination-causing leak occurred during the Exxon defendants' ownership of the property, it need not address plaintiffs' argument that they could prevail under the "alternative liability" rule set forth in *Zands*, 797 F.Supp. at 817–818. However, in the interest of simplifying the issues at trial, the Court notes that this rule is currently unavailable to plaintiffs. Under the rule, a plaintiff faced with consecutive ownership of a gasoline station can establish a prima facie case of contribution by showing that at least some contamination-causing leakage occurred before plaintiff acquired ownership of the property. *See id.* at 817. Upon establishment of this element, the burden shifts to the prior owners to prove that this did not happen during their ownership. *See id.* at 818. However, a requirement of the rule is that plaintiff join "as defendants all persons who owned the property or operated the gas station for at least a portion of the time during which the contamination occurred[.]" *Id.* at 817. Here, Lehigh Petroleum, the operator of a gas station on the property prior to 1958, is not joined as a defendant and thus plaintiffs cannot avail themselves of the rule. Plaintiffs

argue that they need not join Lehigh because Lehigh did not operate the gas station during the period, 1958–1980, when they allege contamination occurred. However, since the period of contamination is exactly what plaintiffs are seeking to prove, plaintiffs' argument is circular. By the words "the time during which the contamination occurred," the *Zands* Court was clearly referring to the time period before the plaintiff acquired ownership, not to a time period identified by the plaintiff itself. Plaintiffs further argue that Lehigh is defunct and thus not available to be joined. Even if true, this fact is irrelevant to whether or not plaintiffs can avail themselves of the alternative liability rule. *See Aurora*, 990 F.Supp. at 1031 n. 5. Application of the rule requires joinder of all potential defendants; if that is impossible, plaintiffs must proceed under the more stringent general theory of liability discussed above. *See id.* This same principle would also require the joinder of all individuals who operated a franchised service station at 92 Granite Street.

5. This provision was originally codified at R.I.Gen.Laws § 46–12–30. Subsequently, the provision was recodified at § 46–12–21. *See* 1983 R.I.Pub.Laws, ch. 149, § 1.

only applies prospectively, nor do they put forth evidence of post–1980 leaks. They argue, however, that since the "leaked product has been a continual and persistent cause of the current contamination[,]" Pl's Br. at 29, their claim that the Exxon defendants have failed to remediate the contamination seeks only prospective application of the statute. Applying Rhode Island law, this Court agrees with the Exxon defendants.

The Rhode Island Supreme Court faced an almost identical issue in *Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.*, 640 A.2d 950 (R.I.1994). In that case, there was evidence of a trichloroethylene (TCE) leak which occurred in 1969, during the defendant's ownership of the property. *See id.* at 952–953. Defendant subsequently sold the property in 1976. *See id.* at 953. Plaintiff, the current owner of the property, was attempting to hold defendant liable under § 46–12–21 for current groundwater contamination resulting from the spill. *See id.* at 953–954. The Court affirmed the grant of summary judgment to the defendant because it concluded that plaintiff was attempting to apply the statute retroactively in the absence of any legislative intent for such retroactive application. *See id.* at 954–955. Specifically, the Court found that because the spill occurred eleven years prior to the statute's enactment and because defendant sold the property six years prior, the statute could not reach defendant's conduct. *See id.* at 954. Thus, the *Hydro–Manufacturing* Court clearly established that one does not violate § 46–12–21 by failing to remediate a spill that occurred prior to the statute's enactment, even if the resulting contamination persists subsequent to that date.

The sole distinction between *Hydro–Manufacturing* and the case at bar, upon which plaintiffs rely, is that the Exxon defendants in this case owned the property until 1985, five years after the enactment of the statute, as opposed to Kayser–Roth who had sold the property prior to the statute's enactment. Thus, plaintiffs seek to characterize the *Hydro–Manufacturing* ruling as applying only to defendants who no longer owned the property at issue when the statute was enacted. Applying this interpretation, the Exxon defendants could be held liable under the statute for failing to remediate the alleged pre-enactment leaks during the five years they owned the property when the statute was in force.

There is some support for this argument. In *Hydro–Manufacturing*, the Court also considered whether the defendant could be held liable to the plaintiff for negligence. *See id.* at 955–957. The Court held that a negligence action could not lie because the defendant was under no duty to subsequent owners to "maintain the property and to refrain from any activity that may harm the property." *Id.* at 955. The Court stated, however, that its conclusion was in part predicated on "recent state and federal statutory laws that impose liability running from landowners to subsequent remote purchasers." *Id.* at 956. Specifically, the Court stated that § 46–12–21 "imposes a liability running from landowners to future purchasers and anyone else who is harmed by pollution that affects groundwater." *Id.* This dicta, along with the Court's mention of the property's sale in its holding, arguably could be read to imply that the Court intended property ownership to trigger a heightened duty under the statute, one which it did not impose on non-owners, to remediate spills which occurred before the statute's enactment. However, this Court concludes that the *Hydro–Manufacturing* Court did not so intend.

First, the quoted language regarding § 46–12–21 could simply have been restating the duty created by the statute, and therefore effective in 1980, of all persons, including landowners, to refrain from causing groundwater contamination by leaks or spills. This interpretation makes more sense in light of the entire discussion of the Court. The common law duty that the Court was considering was one to "maintain the property and to refrain" from

harmful activities. *See id.* at 955. The Court was not contemplating an affirmative duty to clean up contamination resulting from past actions. Additionally, the Court was not basing its failure to impose a common law duty on property owners solely on the ostensible existence of such a duty created by § 46–12–21. The Court referenced both federal and state statutes and the Court in fact went on to conclude that the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–9675 ("CERCLA"), provided the plaintiff in that case with a cause of action. *See id.* at 956. Therefore, a heightened duty under § 46–12–21 on property owners was not essential to the denial of a common law duty.

Furthermore, and perhaps more importantly, the statute itself does not contemplate any such heightened duty on the part of property owners. This statute, unlike RCRA as discussed above, does not trigger duties based on "ownership." Since the Rhode Island Supreme Court has already interpreted the language "negligently or intentionally pollute groundwater" as excluding the failure to remediate a pre-enactment act of contamination, such as a spill or leak, this Court will not except from that exclusion a property owner's failure to remediate such an occurrence.

Accordingly, the Exxon defendants are entitled to summary judgment on Count III.

V. Conclusion

For the preceding reasons, the Exxon defendants' motion for summary judgment on Counts I and II is denied. The parties will direct themselves at trial to the factual issues discussed above. However, the Exxon defendants' motion for summary judgment on Count III is granted. No judgment shall enter until all claims are resolved.

It is so ordered.